## OLD DOMINION S. S. CO. v. CITY OF NEW YORK et al.

(District Court, S. D. New York. September 28, 1921.)

1. **Estates** ⊂⊃1—**"Premises" defined.**
"Premises" may mean either statements previously made or merely that which has gone before, but in speaking of estates the word means lands and tenements.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Premises.]

2. **Wharves** ⊂⊃16—**"Wharfage" defined.**
"Wharfage" is money paid for landing goods on or loading them from a wharf.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Wharfage.]

3. **Wharves** ⊂⊃16—**"Premises," within covenant against assignment or subletting of wharfage, held to refer to the transfer or attempted transfer of any part of wharfage.**
The word "premises," within the phrase "premises or the wharfage," as used in covenant against assignment or subletting of wharfage, *held* to refer to the transfer or attempted transfer of any part of the wharfage.

4. **Wharves** ⊂⊃16—**Steamship liable for wharfage, not only while she lies alongside berth, but while discharging space is occupied by cargo.**
By reason of the immemorial custom of the port of New York, when a steamship engages a berth, wharfage by that name is due and payable, not only while she lies alongside, but while the discharging space is occupied by her cargo.

Decree affirmed, 286 Fed. 157.

Loomis & Jones, of New York City, for plaintiff.

John P. O'Brien, Corp. Counsel, of New York City (Charles J. Nehrbas, of New York City, of counsel), for defendants.

HOUGH, Circuit Judge. It is not thought necessary to analyze the affidavits submitted. The documentary facts are not in dispute, and neither are most of the other facts in the sense of things seen or said; but the affiants have attached an intent or purpose to what their opponents said or suffered to be done, and no one can ever arrive at a reasonably satisfactory solution of this question of intent or purpose until witnesses have been cross-examined. It may be summarily stated that I regard this case as eminently suitable for equity, in that the plaintiff has nothing that can be called a remedy at law. Any attempt at assessing damages before a jury for the loss of Pier 26 (renewal and all) would be a farce.

The question, therefore, is whether, upon the affidavits, reasonable ground appears for maintaining as nearly as possible the status that existed when the stay order was procured, namely, August 1, 1921. That August 1 was a Monday, and on the preceding Saturday, July 30, the commissioner of docks had served a paper upon the plaintiff declar-

ing that its leasehold of Pier 26 would instanter "cease and come to an end." By said document the commissioner also "ordered" the plaintiff to "vacate the premises forthwith." ‘ .

On Sunday, July 31, the then existing arrangements between the Steamship Company and the Transportation Company (which was using Pier 26) would come to a formal end; the relations between the two corporations were strained and unfriendly, and the actual result of the commissioner's order and the substantially contemporaneous stay order herein has been to maintain the physical use of Pier 26 by the Transportation Company, with the material difference that the remuneration for such use has been collected by the commissioner, instead of by the Steamship Company. It thus appears that the status quo has been maintained, except that the commissioner has diverted payment by the Transportation Company to himself, while refusing payment from the Steamship Company. '

I have concluded to maintain as nearly as seems just and reasonable the status on the last of July until the trial of this case. As the foundation for the reasons or reasoning leading me to this conclusion, some definitions of a very familiar nature may be restated:

[1] That is a lease which is sufficient to explain the intent of the parties—that one shall divest himself of the possession and the other come into it for a determinate time. "Premises" may mean either (1) statements previously made or merely that which has gone before; but in speaking of estates the word means (2) lands and tenements.

[2] "Wharfage" is money paid for landing goods upon or loading them from a wharf. The habendum clause of plaintiff's lease from the city conveys nothing but the wharfage which may arise from Pier 26.

[3] The word "premises" first occurs in the repair clause of the lease, and there may well refer to tenements erected upon land under water. But when the phrase "premises or the wharfage" is used in the covenant against assignment or subletting, I incline to think that the word "premises" here can only refer to the transfer or attempted transfer of any part of that which the city had itself leased, to wit, wharfage. '

The very common form of lease here shown undoubtedly gave to the plaintiff exclusive possession for many purposes of a wharf or pier, to wit, of certain land under water and the tenement erected thereupon; such a lessee may reserve his wharf for his own use, or he may charge any rate for his wharfage (as above defined) that he may agree upon with a customer. The Allan Wilde (C. C. A.) 264 Fed. 291. There was nothing illegal or immoral in the rates for wharfage charged by the Steamship Company to the Transportation Company down to the end of last July. I perceive no justification for the use of that merely abusive word "profiteering" in some of the documents submitted.

[4] It is too well known to need citation or reference to papers that, when a steamship engages a berth, wharfage by that name is due and payable, not only while she lies alongside, but while the discharging space is occupied by her cargo. This is the immemorial custom of this

port. I am satisfied, not only from the affidavits, but from the course of business, that during the whole time referred to in what the city calls a leasing agreement the Transportation Company was occupying a portion of Pier 26, and such occupation consisted not only, nor indeed principally, in having a steamship lying alongside, but in using a convenient portion of the pier for cargo that had been unladen, or which it was intended to put on board.

It was admitted at argument (and is perfectly plain) that no written document exists which can be called a lease from Steamship Company to Transportation Company. Thus the question becomes merely this, viz.: Does the course of business and all the spoken words of plaintiff's officers evidence an intent (carried into practice) of leasing to Transportation Company? As above indicated, there is nothing in the course of business per se to show a lease. A fleet of vessels, one after the other, might lie at the same berth for years, and the owner of the fleet might have an exclusive right of berthing and paying wharfage; but that business would not make him a lessee. It is all a question of intent, and I am wholly unable to perceive any such intent from these affidavits.

As above stated, however, I am regretfully convinced that there is much ill feeling between plaintiff and Transportation Company, and that ill feeling has not been lessened by the not definitely stated, but clearly discernible, fact that this whole trouble has arisen because Transportation Company went to the commissioner of docks, or the commissioner of accounts, or both, and enlisted him or them on its side of a purely private controversy. But it does not appear, nor has it been suggested in argument, that if Transportation Company had continued to pay wharfage at going rates to Steamship Company, the latter would not have been glad to have its wharf property used at such rates. It is to be feared now (to speak plainly) that from anger plaintiff will seek to prevent Transportation Company from using that which it did use down to August 1 last.

It will therefore be ordered that defendants be enjoined as prayed for pendente lite; that the bond heretofore given under Judge Knox's order will be continued in compliance with the act of Congress; but that as a condition of obtaining this relief plaintiffs will suffer and permit Transportation Company, upon making payment at a just rate— apparently $200 per day—to continue to use the wharf space which it did use on July 30, 1921, until the further order of this court.