MANHATTAN LIGHTERAGE CORPORA-
TION v. MOORE–McCORMACK LINE,
Inc., et al.

CANADA PACKERS, Ltd., et al. v. CITY
OF NEW YORK.

Nos. 16104, 16249.

District Court, E. D. New York.

April 8, 1940.

Burlingham, Veeder, Clark & Hupper,
of New York City (S. R. Wright, of New

York City, of counsel), for Manhattan Lighterage Corporation.

Bigham, Englar, Jones & Houston, of New York City (R. F. Shaw, of New York City, of counsel), for Cargo Libellants.

Hagen & Eidenbach, of New York City (Charles W. Hagen, of New York City, of counsel), for Moore-McCormack Line, Inc.

William C. Chanler, Corp. Counsel, New York City (George Seagrave Franklin, Asst. Corp. Counsel, of New York City, of counsel), for respondent City.

INCH, District Judge.

Libellant, Manhattan Lighterage Corporation, in the first suit, owned the derrick lighter Biltmore which on October 3, 1940, sunk, while alongside of Pier 32, North River, and dumped over a cargo of pickled beef in barrels belonging to the Canada Packers, Ltd., which is the libellant in the second suit.

The Manhattan (so referred to for convenience) sued both the City of New York, as the owner of Pier 32, and the Moore-McCormack Line, Inc., a steamship company (referred to as the Steamship Company), one of whose steamships, the Brazil, had brought the cargo of pickled beef to that pier a day or so before the accident, for the purpose of reloading same on the Biltmore.

The Canada Company (so referred to for convenience) brought suit against the City of New York, the latter impleaded the Moore-McCormack Line, Inc., and the Manhattan Company.

The two suits were tried together under a due stipulation and the testimony taken was made available in each suit. Ownership, incorporation and such details were also duly stipulated and the real question at issue is, what respondent is liable for the damage suffered by the lighter and the cargo?

There is nothing to indicate why the Manhattan Company should be liable and the petition impleading it must be dismissed. There is also no substantial proof indicating that the Manhattan Company and the Canada Company should not recover for their damage against one or both of the remaining respondents.

The question of liability of one or both of these respondents depends on a correct finding of the relation of these parties to Pier 32, at the time in question. Such responsibility rests on which respondent furnished an unsafe berth for the Biltmore. On these questions of fact a considerable amount of testimony has been taken.

The Steamship Company claims that Pier 32, at the time of the accident, October 3, 1940, was and had been for a long time previous a public pier owned and maintained by the City of New York and that only in the event of actual notice of the defective condition of the berth, or circumstances which reasonably would put the Steamship Company on notice of its defective condition, could the Steamship Company be held responsible for what occurred. That the City of New York had absolute and exclusive control over the repair of Pier 32 and the slip and, in fact, removed the offending pile after the accident.

The City of New York on the other hand claims that for almost a year prior to the accident, and at the time that it occurred, the Steamship Company had exclusive use of Pier 32 and that anything that was defective in the slip or pier, making same unsafe, was the sole responsibility of the Steamship Company.

However, the Steamship Company never collected wharfage from any vessels berthed at Pier 32 and in this connection it should be noted that during the months prior to the accident and during which the City now claims that the Steamship Company had exclusive control, other vessels were allowed, by the City, to dock at this pier on which wharfage was collected by the City, the explanation as to some, being that this was done as "a neighborly accommodation".

Before coming to a decision on this issue it may be well to briefly state certain facts.

A day or so before October 3, 1940, the Steamship Company notified the City that its steamship Brazil would arrive in New York and asked and obtained a temporary wharfage permit to berth her alongside the north side of Pier 32, North River, where she would unload certain cargo. This was one of approximately 55 similar temporary wharfage permits which had been asked for and granted to the Steamship Company during the previous nine months. Each of these permits were limited to a definite vessel and were for a definite purpose. To be sure they included the usual conditions, one of which was that if any damage was done by the

temporary occupancy the Steamship Company would be responsible for and repair same.

There is no proof that the broken fender in question was caused by anything the Steamship Company did. The evidence shows that along about the beginning of 1940, the Steamship Company decided to operate a number of vessels, consisting of large steamships which is referred to as the "good neighbor fleet". One of these was the Brazil.

It is evident that the City of New York was quite anxious to obtain the business of this Steamship Company in this regard, but before it could do so at Pier 32, considerable work would have to be done in construction and repair of that pier.

The Steamship Company had asked early in 1940, for a broad survey at the pier and slips in order to ascertain the extent of this work but such survey did not take place until after the accident near the end of the year when negotiations for exclusive possession by the Steamship Company had substantially been completed. In the meantime the City of New York proceeded to do all the work that seemed to be necessary to eventually get the pier and slips in proper shape. During this time therefore, and at the time of the accident, the City of New York remained a wharfinger. From time to time it charged the Steamship Company wharfage and was paid for same.

Wharfage has been defined to be "money paid for landing goods upon or loading them from a wharf". Old Dominion S. S. Co. v. City of New York, D.C., 286 F. 155, 156.

While in the pleadings the City indicates there was a lease of the pier to the Steamship Company no such relation was proved at the time of the accident or prior thereto. At the trial the proof of the City all went to show that while there was no lease there was what was claimed to be an exclusive possession of the pier by the Steamship Company. As to this there can be no doubt that the parties were seriously contemplating a lease in the future and that in anticipation of same the City commenced the construction and repair work, some of which included the fender system along the slip on the north side as well as elsewhere. This work started in February and March, 1940, and consisted of an inspection, removal of damaged or worn piles and their replacement by new ones.

This work however was temporarily suspended in April, 1940, when, according to the testimony of the assistant engineer for the City, in charge of the maintenance and repair of this pier as well as of others of the City from the Battery to Dyckman Street, the general superintendent of the Steamship Company informed him that both the north and south side of Pier 32 would be required by ships and that "we could not work the pile driver at that time or maybe for a few weeks later". He thereupon stopped work temporarily stating as an additional reason, "I was not going to keep that gang of men there because I was getting about 20% of the work done that I should have for the amount of money that was being spent".

Apparently a survey of the piling was made between March 29, and April 10, 1940, by the city engineer and his assistant. This was the last survey by the City of the fender piles, about six months before the accident which occurred on October 3, 1940. The engineer in charge for the City also testified, "the only time I would go to Pier 32 in 1940, was while I had a dock building force engaged in repairing that Pier". Work was apparently suspended therefore from the middle of April until it was resumed in June and suspended again in September, this time due to the fact that a pile driver had to be repaired and certain parts replaced. The engineer in charge stated, "I didn't go back until October 28, and until November 1st, to examine the fender system".

Regardless therefore of the general work on the pier being done by the City for the Steamship Company, about which so much is here made by the City, it is plain that during the months preceding the accident, and at the time it occurred, the City of New York had absolute and exclusive control over the repair of Pier 32 and the slips. The Dock Department of the City made the above inspections and repair of the fender piling system during the temporary use of the pier by the Steamship Company under these individual wharfage permits, the granting or withholding of which was entirely in the discretion of the Commissioner of Docks. The pier was thus being constructed and repaired by the City or its constructors in connection with the getting of it ready should exclusive possession be eventually given to the Steamship Company, as was hoped, and a lease thereof made to the Steamship Company.

After the accident, about two weeks thereafter, this work of the City had about been completed and exclusive possession was temporarily given to the Steamship Company in the form of a "revocable permit". Shortly thereafter, in December, a five-year lease of the pier to the Steamship Company was agreed to by the parties.

The effort of the City to now give retroactive effect to such arrangements to cover this accident is unavailing to change the relationship of wharfinger and permittee existing on October 3, the date of the accident and prior thereto. It is plain that without a lease had the Steamship Company, for some reason, claimed exclusive possession of the pier and slips prior to the accident, the City would have been heard from in no uncertain terms.

The City being a wharfinger at the time in question it was called on to exercise reasonable care to ascertain the condition of the berths at its pier and to remove dangerous obstructions or give notice of the existence thereof to vessels about to use the berth. M. & J. Tracy Inc., v. Marks, Lissberger & Son, Inc., 2 Cir., 283 F. 100, and cases there cited.

Was this duty to use reasonable care duly performed by the City? That the berth where the Biltmore lay was dangerous and unsafe is sufficiently proved, for about four feet below the water at low tide at this place there was a large broken fender and while this obstruction might not be seen from the dock, reasonable care required those representing the City, then engaged in the work of repairing and making safe the fender system on this side of the pier, to ascertain by reasonable investigation whether there was any such broken pile likely to be dangerous to its permittee and notify the Steamship Company that it should not place the lighter at such a berth or do so at its own risk, before granting the permit. That it was a very real danger and unsafe berth is shown by what happened on October 3, 1940. Yet the City gave no such notice or warning and in fact failed to reasonably investigate the berth.

In accordance with the wharfinger permit the Brazil had unloaded on the pier a quantity of barrels of pickled beef weighing approximately 365 pounds each. The Steamship Company then engaged the lighter Biltmore to come to Pier 32 and take on board these barrels. She arrived about eight o'clock in the morning and was placed alongside the pier where these barrels had been unloaded. This was in the neighborhood of door 62 on the pier. The lighter was 96 feet long with a rake at each end making her bottom length a little over 80 feet. Work was started and there is nothing to indicate any improper loading of the lighter which was being supervised by the captain of the lighter. About two o'clock in the afternoon when the lighter had loaded approximately 498 barrels of the approximately total weight of 90 tons she was found to be making water. The lighter's carrying capacity exceeded 400 tons and she was in seaworthy condition having been gone over a year before and thoroughly overhauled. Shortly thereafter the lighter careened, dumped her load of barrels and sank. Then it was found that this broken off pile, on which the lighter had gradually rested as she took on her load, had put a large hole in her bottom planks.

It seems to me therefore in view of the foregoing work and the inspection admittedly being carried on by the City, that ordinary care and inspection would have shown that this danger existed and that before granting a permit to the Steamship Company to unload and berth a lighter to load the merchandise in question some notice to the Steamship Company that that section of the pier had not been repaired or inspected and might be unsafe for a lighter to berth should have been given. Nothing of this sort was done or even suggested in the evidence and as the wharfinger and owner of the pier the City is liable.

Another question however is presented by the use of this pier by the Steamship Company, although such use was not exclusive, as to whether or not the representatives of the Steamship Company should have berthed the lighter at the place in question without some inspection of the water beneath.

The City's claim apparently is that any danger under the water belonged to a separate department of the City. The engineer testified, "if there was a part of a broken spile there that would come under the Bureau of Hydrographers". However the presence of this underwater pile was carelessly not discovered until after the accident and then the City promptly proceeded to raise and take it out of the

way. It apparently could not be seen by a mere look from the dock.

O'Rourke, the superintendent of the Steamship Company said he knew nothing of this condition of the berth where the Biltmore was moored. That he had never received any complaint from anybody about the piles or the berth where the lighter was moored. No notice of any kind had been given by the City.

Whitaker, the foreman of the Manhattan Company testified he did not see that there was a pile missing from the face of the pier, that he had been on the pier about two hours in the morning of October 3rd.

█ It seems to me therefore that while there was likewise a duty to use due care resting upon the Steamship Company that there is insufficient proof to justify a finding that it was also negligent. The pile could not be seen from the dock. It was several feet under the water at low tide. There was apparently nothing to put the representatives of the Steamship Company on notice that there was any danger. It was well known to the Steamship Company that the City supposedly had been making and apparently was making a careful survey and inspection and repair of the fender system which would also reasonably include the safety of this berth alongside the pier.

There is a reasonable inference that this dangerous pile had existed for several months and that some careful inspection of that locality had supposedly likewise taken place, of which a permittee would be notified in some way if there was danger.

█ In the circumstances it seems to me that the Steamship Company was reasonably allowed, in the absence of actual notice, or facts calling for its own investigation, to rely upon the good reputation of the berth and the fact that it had been granted without any notice of danger a wharfinger's permit for the berthing of its vessels.

The Manhattan Company, libellant, is entitled to decree against the City with costs. Its libel against the Steamship Company is dismissed with costs. The Canada Company, libellant, is entitled to a decree against the City with costs. The petition of the City to implead the Steamship Company and the Manhattan Company is dismissed without costs.

I make the following findings of fact and conclusions of law.

### Findings of Fact.

1. About 8:15 A. M. on October 3, 1940, libellant's lighter Biltmore started loading a cargo of pickled beef in barrels from the upper deck of Pier 32, North River, alongside Door 62.

2. Loading of the lighter Biltmore at Pier 32 had been in charge of employees of Manhattan Lighterage Corporation.

3. At 2:00 P. M., when about 498 barrels were aboard, the lighter captain observed that her bow was lower in the water than he expected it to be, whereupon he went forward, looked down the hatch and saw water running into the hold "like Niagara Falls".

4. The lighter settled quickly by the bow and within a few minutes careened and dumped her cargo overboard on the offshore side.

5. Underwater examinations disclosed a fender pile broken off below the surface of the water, firmly embedded in the bottom and leaning away from the face of the pier into the berth that had been occupied by the Biltmore.

6. The broken pile was 4 to 4½ feet under water at the time of the accident and the Biltmore's draft forward, with her part cargo stowed as it was, was about 4½ feet.

7. The broken fender pile which caused the Biltmore to sink was removed after the accident by the City of New York.

8. When the Biltmore was hauled out on dry dock it was discovered that she had a hole in her bottom near the starboard side, about 20 feet from the bow, and as the lighter lay at the time of the accident, the bottom planks that were stove in were abreast the column between Doors 60 and 62 and over the broken pile.

9. No inference is possible other than that the broken pile holed the lighter.

10. The cargo on the lighter was stowed in the usual and proper manner and the lighter was in good condition until she rested on the broken pile on the falling tide.

11. Respondent, Moore-McCormack Lines Inc., had been using Pier 32 since the preceding February under a series of permits from the City of New York, the owner of the pier, to berth specified vessels, and invited the lighter to use the berth.

█ 12. Marine growth on the broken end of the pile and on the hook chain

276

around it indicated that the pile had been broken for many months, and the fact that a pile was missing from the above water portion of the fender system was constructive notice to those charged with the maintenance of the pier that a dangerous condition probably existed.

13. The City's last inspection of the fender system was completed on April 10, 1940, after the City had suspended its repairing of the piling, leaving at least six weeks' work undone.

14. Any reasonable inspection of the fender piles by the City's dock builders and maintenance men would have disclosed the dangerous condition to which the Biltmore was exposed.

15. At the time of the accident the City was preparing the pier for occupancy by Moore-McCormack Lines, Inc., and some time thereafter that company did obtain exclusive occupancy.

16. Pier 32, North River, is a public pier, owned by the City of New York and at the time of the accident was being rebuilt of the City of New York in anticipation of exclusive occupancy by respondent, Moore-McCormack Lines, Inc., under a five-year lease, to be executed on acceptance of the pier by Moore-McCormack Lines, Inc.

17. At various times respondent, Moore-McCormack Lines, Inc., obtained permission to dock its ships at Pier 32 under permits, issued for each ship docked.

18. For the privilege of docking its ships, Moore-McCormack Lines, Inc., paid wharfage to the City of New York, the charge being adjusted on the tonnage of the vessel docked.

19. There was no exclusive use of Pier 32 by respondent Moore-McCormack Lines, Inc., and the City of New York collected wharfage from other vessels using Pier 32.

20. In accordance with the conditions of the permit, respondent, Moore-McCormack Lines, Inc., paid for water and electricity used at Pier 32, and likewise made certain minor repairs and temporary installations, which were approved in advance by the Commissioner of Docks.

21. On October 11, 1940, after the accident, respondent, Moore-McCormack Lines, Inc., first obtained exclusive occupancy of Pier 32, and on October 15,

1940, the City of New York ceased collecting wharfage at Pier 32.

22. Respondent, Moore-McCormack Lines, Inc., paid wharfage for the period from October 1st to October 15th, 1940, but thereafter paid rental for the period from October 16th to December 31st, 1940.

23. At the time of the accident respondent, Moore-McCormack Lines, Inc., was not in exclusive possession of Pier 32 and had no control or jurisdiction over the maintenance of Pier 32.

24. Moore-McCormack Lines, Inc., did not have notice or knowledge of the dangerous condition which caused the sinking of the lighter Biltmore.

25. That said cargo libellants sustained damage as a result of the careening of the lighter Biltmore while moored on the northerly side of Pier 32, North River, about 2 P. M. on October 3, 1940, on account of which said cargo fell into the slip.

26. That the lighter Biltmore careened and dumped her cargo as a result of her resting on a submerged broken off fender pile, which extended out in the slip abreast of the column between Doors 60 and 62 on the north side of Pier 32, North River.

27. That said pile constituted a menace to lighters or other harbor craft moored in the position occupied by the Biltmore.

28. That the menace created by the broken off pile had existed for a considerable length of time and could have been discovered by the exercise of reasonable diligence on the part of the wharfinger.

29. That no warning was given of the unsafe condition of the berth occupied by the lighter Biltmore or of the presence of the submerged broken off pile.

30. That the berth occupied by the Biltmore was unsafe on account of the presence of said submerged broken off fender pile.

31. That the respondent, the City of New York, did not exercise reasonable diligence to ascertain the character of the berth in question and in maintaining same in a safe condition.

32. That the respondent, the City of New York, was the owner of said pier, which at the time of the accident was occupied by the respondent-impleaded, Moore-McCormack Lines, Inc., on a daily wharfage basis.

33. That the lighter Biltmore was lawfully occupying the berth where the accident occurred.

Conclusions of Law.

1. The City of New York, as owner of the pier, is liable to the libellants for the damage sustained by the lighter and her cargo.

2. Libellants were without fault and shall have a decree for their damage in full against the City of New York.

3. The City of New York, as owner of the pier, was the wharfinger at the time of the accident, and is liable for any damage sustained by the Biltmore and her cargo.

4. Respondent, Moore-McCormack Lines, Inc., is not liable for the damage sustained by the Biltmore and her cargo.

5. No relationship of landlord and tenant existed between the City of New York, as owner of Pier 32, and respondent, Moore-McCormack Lines, Inc. At the time of the accident Moore-McCormack Lines, Inc., did not have exclusive right to possession or use of Pier 32, but only had the privilege of berthing the SS Brazil and handling her cargo under the permit issued by the City of New York.

6. Respondent, Moore-McCormack Lines, Inc., exercised no control whatsoever over the granting of permits or the maintenance of Pier 32.

7. The City of New York had absolute and exclusive control over the maintenance and repair of Pier 32, North River, at the time of the accident.

8. That the respondent, the City of New York, was in the position of wharfinger in so far as concerns the lighter Biltmore and her cargo.

9. That the said respondent was obligated to exercise reasonable diligence in ascertaining the character of the berth occupied by the lighter Biltmore and to remove the pile in question or give notice of its presence.

10. That respondent, the City of New York, negligently failed in its duty either to provide a safe berth for the lighter Biltmore or to exercise reasonable diligence in respect thereof.

11. That said cargo libellants are entitled to an interlocutory decree against the respondent the City of New York, for the full amount of damages sustained on account of this accident with costs.