**H.R.M., INC., Plaintiff,**

**v.**

**S/V VENTURE VII, George Ford, and American Eagle Ins. Co., Defendants/Third-Party Plaintiffs,**

**v.**

**New York Yacht Club and Dunbar Yachts, Inc., Third-Party Defendants.**

**C.A. No. 96–205B.**

United States District Court, D. Rhode Island.

July 10, 1997.

Daniel P. McKiernan, Hanson, Curran, Parks & Whitman, Providence, RI, for Plaintiff.

Frederick A. Lovejoy, Providence, RI, for Defendants.

Seth S. Holbrook, Holbrook & Murphy, Boston, MA, Richard S. Humphrey, Tiverton, RI, for Third–Party Defendants.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

Defendant and third-party plaintiff George Ford, ("Ford") purchased a 53–foot Mason cutter-style sailing vessel in Maine in 1995. He named this vessel the Venture VII. Before he purchased the Venture VII, Ford had a marine surveyor, Clyde Eaton, appraise the vessel. Eaton opined that the value of the vessel was then $495,000. Ford purchased the Venture VII for an amount not in evidence, but alleged to be considerably lower than the $495,000 value Eaton estimated for the vessel.

Ford employed Sean Murphy to captain the Venture VII on pleasure cruises and ocean voyages to other ports, and provide other services including maintenance and repair of the vessel. Ford kept the Venture VII in Maine until the end of the summer 1995 sailing season, when Ford instructed Murphy to sail the Venture VII south, to a winter mooring that had been arranged for her in Annapolis, Maryland. Before making the trip south, Ford and Murphy had certain sails and other equipment removed from the Venture VII, in order to make her more seaworthy for an open-ocean voyage of the planned length. One stop the Venture VII was scheduled to make along the way to Annapolis was in Newport, Rhode Island.

On September 10, 1995, the Venture VII arrived in Newport Harbor, with Murphy at the helm. He radioed the Newport Harbor facility of the New York Yacht Club, (NYYC), of which Ford is a member and where Ford had arranged for a mooring, for the Venture VII. Murphy was directed to the mooring the club had assigned to the Venture VII, mooring # 652. The Yacht Club had assigned the Venture VII to this mooring based on the length of the vessel because mooring # 652 was allegedly appropriate to secure sailing vessels of up to 65 feet in length.

Mooring # 652 is owned by Mr. Bart Dunbar, proprietor of Dunbar Yachts, Inc., (collectively, "Dunbar"), and is leased to NYYC for use as a mooring by members of the club and others on a transient rental basis. It is anchored with a 750 pound mushroom-shaped weight on the harbor floor, with a line attached which connects the anchor to a buoy floating on the surface. Attached to the buoy was another line which Murphy used to secure the vessel. This line is called the "pennant" or "painter" line. At least part of the length of the line from the buoy to the boat was protected by "chafing gear," a shroud of plastic or rubber surrounding the

line, intended to prevent sharp edges of the vessel from coming directly into contact with the line, and thus insure that rubbing or "chafing" on sharp edges will not wear through the fibers of the line, which might cause it ultimately to part.

Murphy tied the Venture VII to mooring # 652 using a line attached to the mooring buoy before his arrival and then used the club launch to get ashore. Murphy did not recall whether a second line was attached to the buoy, but testified that he used only one line to secure the Venture VII. Murphy also testified that he examined the line from the buoy and the chafing gear at the time he first used the line to secure the Venture VII, and each day thereafter until September 16th, and found both in acceptable condition each time. On September 16th, Murphy heard that a small storm was expected, and again checked the mooring line and chafing gear securing the Venture VII and again found them in acceptable condition. Neither at this time nor at any other did Murphy use any of the Venture VII's chafing gear to supplement that provided with the mooring line or add a second line to the buoy. On September 17, Murphy left Newport by car on a day trip to Boston with another member of Ford's crew.

The storm which blew through Narragansett Bay on September 17, 1995 was somewhat stronger than expected. Winds of 25 to 35 knots were reported, initially from the southwest, but shifting later to the north-northwest, with waves of between 2 and 6 feet, depending on the local conditions. It was a classic Nor'easter. During the course of the storm, the Newport Harbormaster was informed that several boats had broken free of their moorings and put out a radio bulletin to that effect. While investigating the effects of the storm, an assistant harbormaster saw the Venture VII, freed from its mooring, pass his boat and run aground on a rocky area of Bretton Cove. The assistant harbormaster initially considered attempting to remove the Venture VII from its predicament, but was immediately called away to another, more urgent matter involving other boats, reportedly with passengers aboard, which

had broken free of their moorings during the storm.

Across Narragansett Bay, at his base in Wickford, R.I., John Andrews, owner of H.R.M, Inc., was standing watch. H.R.M is a Privately owned "quick-response" marine salvage and towing company which serves Narragansett Bay and Rhode Island Sound. Part of H.R.M.'s mission is to respond to situations in which vessels are in danger, in order to provide emergency relief services, known as "salvage." Andrews has gone to some length and considerable expense to obtain vessels and equipment equal to the task of providing Salvage services in Narragansett Bay. Two of H.R.M.'s vessels, the Sale Sea and the Safe Sea/ Newport, have been specially designed and constructed for this particular use. Both vessels feature special fendering systems to prevent damage in case of contact with other vessels and a "jet-drive" system, which provides exceptional power and control to the operator, but also allows these boats to be used in shallower water than boats equipped with standard keels and drive motors.

When John Andrews heard on the radio at approximately 7:15 p.m. that vessels had broken loose of their moorings in Newport Harbor, he immediately notified members of his staff to report to the H.R.M. facility to launch H.R.M boats and provide salvage service in Newport Harbor, if necessary. Captain Chris Anderson reported, within minutes and was underway on H.R.M.'s vessel Safe Sea/Newport immediately. Unbeknownst to Andrews, Anderson had brought his girlfriend along, although she was not employed by H.R.M. and did not take part in Anderson's salvage activities that night. While Anderson was en route to Newport Harbor, Peter Andrews, John's son and an employed of H.R.M., reported to H.R.M.'s Wickford facility and prepared to sortie H.R.M.'s vessel Safe Sea. When John Andrews arrived, he and Peter Andrews set out for Newport Harbor, approximately 15 to 20 minutes behind Anderson.

Upon his arrival in the Bretton Cove area of Newport Harbor, Anderson noticed the Venture VII in a dangerous position, with her bow landward on the rocks along the

shore. The waves crashing against the shore at the point where the Venture VII was aground would lift the boat off the rocks only to drop her against them again when the waves receded. Winds in the area were reported in the 25 to 35 knot range, out of the north-northwest, and 3 to 5 foot seas resulted during the height of the storm. The Venture VII had been moored and was stranded in an area open to the north, and therefore no land or breakwater provided shelter from the weather.

Anderson approached the Venture VII and assessed her situation for several minutes while he formulated a strategy to pull the vessel off the rocks. Ultimately, Anderson was able to maneuver his boat, the Safe Sea/Newport, into a position close to the Venture VII and from there was able to loop a line around a winch on the Venture VII's stern. He then secured this line to the Safe Sea/Newport and pulled away a safe distance, paying out line between the vessels. Anderson then was able to render the line more taut when the Venture VII was lifted off the rocks and give more slack when she was dropped onto the rocks again. Anderson carefully pulled the Venture VII off the rocks and when she was floating free of the bottom, towed her a safe distance into the Cove. There, because his tow line was fastened to the stern of the Venture VII and it would be unsafe to tow her in that manner, he awaited the arrival of the Safe Sea, with John and Peter Andrews aboard. That part of the rescue effort took approximately 20 minutes.

When John and Peter Andrews at arrived, Anderson boarded the Venture VII to check her condition and see if she was taking on water. When he discovered that the she appeared to be watertight, he tied the Safe Sea/Newport to the Venture VII's stern and attached a line from the Safe Sea to the her bow. Anderson stayed on board the Venture VII to pilot her during the tow. The Safe Sea, with John Andrews at the helm, then towed the Venture VII and the Safe Sea/Newport northward through the mooring field in Bretton Cove. Progress was slow because the other boats were moving on their moorings in the field, presenting a danger of collision with the boats involved in the tow. Andrews elected to tow through the mooring field despite this danger, because he felt that he could better control the tow following this route. Once the Safe Sea towed the Venture VII and the Safe Sea/Newport into open water, the three boats proceeded to a safe mooring on Goat Island without further incident.

After the rescue of the Venture VII, H.R.M.'s staff was notified of another vessel in peril, the "Breed vessel," known as the Solitude. They responded to this situation and brought the Solitude to safe mooring at Goat Island as well. John Andrews stayed overnight with the two vessels and in the morning hired a diver to inspect their hulls for any serious structural damage. Andrews paid the diver $150.00 for inspecting both vessels. In the morning, the owners of the Solitude and the Venture VII were contacted and informed of what had happened to the vessels. Arrangements were then made to return the vessels to their owners, which occurred later that day.

The Venture VII required repair because the grounding caused damage to her hull. These repairs were completed by a Narragansett Bay facility at a cost of approximately $40,000. Murphy allegedly performed additional repair work on the vessel worth approximately $12,000. A marine surveyor, William Gates was engaged before and during the repair process to estimate the repair cost and oversee the repairs for Ford's insurer, American Eagle. Mr. Gates testified that he never saw Murphy perform any repair work on the vessel or reviewed any work done by Murphy. Mr. Gates and other marine surveyors have been engaged by the parties to provide the court with estimates of the Venture VII post-incident value, but have arrived at widely different figures. At present, the Venture VII is in dry dock at the repair facility, awaiting the outcome of this litigation.

The parties acknowledge that H.R.M. is due a salvage award for its rescue of the Venture VII, but arrive at very different figures for the amount which should he paid. In addition, Ford and American Eagle claim that third-party defendants New York Yacht Club and Dunbar Yachts, Inc. are responsi-

ble not only for the salvage award, but also for the cost of repair to the Venture VII resulting from the incident. Ford and American Eagle Insurance Company allege that NYYC and Dunbar were negligent in providing an "inadequate" mooring, which they allege was the cause of the incident, and that NYYC and Dunbar are therefore responsible for the damages which resulted. NYYC responds that it cannot be sued by Ford, because NYYC is a not-for-profit corporation of which Ford is a member, and NYYC and Dunbar deny any negligence and also assert in response that in any event. Murphy's failure to properly secure the Venture VII was the true cause of the breakaway and resultant damage.

## A. The Salvage Award

■ No doubt exists that a salvage of the Venture VII took place on September 17, 1995. H.R.M. established that it is entitled to a marine salvage award by showing that the Venture VII was in peril, H.R.M. staff voluntarily offered aid, and H.R.M.'s efforts met with success. *The Sabine*, 101 U.S. 384, 384, 25 L.Ed. 982 (1879); *Clifford v. M/V Islander*, 751 F.2d 1, 5 (1st Cir.1984), The parties' dispute is over the amount of award to which H.R.M. is entitled. H.R.M. claims that an award on the order of $100,000 is called for, while the defendants/third party plaintiffs and third party defendants contend that an award in the lower range of $12,000 to $18,000 is appropriate.

The standard by which salvage awards are determined was long ago set down by the Supreme Court in *The Blackwall*, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870 (1869). Since that time, the six factors enumerated in that case, "the labor expended by the salvors in rendering salvage service; the promptitude, skill and energy displayed in rendering the service and saving the property; the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; the risk incurred by the salvors in securing the property from the impending peril; the value of the property saved; the degree of danger from which the property was rescued," have been considered black letter law in setting salvage

awards. *Id.* at 13–14; *Allseas Maritime, S.A. v. M/V Mimosa*, 812 F.2d 243, 246 (5th Cir.1987). These factors have been interpreted as aiding courts in effectuating the purpose of salvage awards, to provide a bounty to salvors to encourage seamen to undertake rescue efforts. *Allseas Maritime*, 812 F.2d at 246; *De Aldamiz v. Th. Skogland & Sons*, 17 F.2d 873, 874 (5th Cir.1927).

■ Mindful of the policy of providing salvors with a bounty, the factors which guide this court's determination suggest a salvage award closer to the range suggested by the defendants and third-party defendants. For example, the labor expended by the salvors in this situation was minimal. The evidence showed that the Venture VII was removed from the rocks and towed to a position of relative safety by one man in less than 20 minutes. The service provided by other H.R.M. staff members in towing the vessel to a safe berth at Goat Island was more in the nature of a tow than salvage service, and added only another 45 minutes to the time spent in securing the vessel. While it may be true that the time spent in effectuating a rescue is not necessarily indicative of the difficulty of the operation, in this situation, the short time spent indicates that a low order of salvage was conducted. *See De Aldamiz*, 17 F.2d at 874 (short time spent in rescue was not basis for reduction of award).

■ The parties agree that H.R.M. "deserves high marks" with regard to the "promptitude, skill and energy displayed" in providing relief to the Venture VII. By standing watch 24 hours a day, 365 days a year, H.R.M. puts itself in a position to render salvage service whenever it may be necessary, on a moment's notice, as was amply demonstrated in this situation. Where professional salvors expend considerable time and effort in preparing to render effective service, such preparation to provide prompt, skillful and energetic service should be rewarded with a liberal salvage award. *B/V Bureau Wijsmuller v. United States*, 487 F.Supp. 156, 172 (S.D.N.Y.1979). In this case, the fact that H.R.M. is a professional salvage company, ready at all times to render the same prompt, skillful and energetic ser-

vice it provided here weighs in favor of a liberal salvage award. *Id.*

■ The value of the property employed by the salvors in rendering the service also demonstrates the readiness of H.R.M. as a professional salvage company. The two vessels H.R.M. staff used to salvage the Venture VII, the Safe Sea and the Safe Sea/Newport, have a combined insured value of approximately $175,000, according to the testimony of H.R.M. owner John Andrews. Consideration of the expense to which H.R.M. is put to provide specialized equipment for salvage service supports a liberal salvage award in this case.

The risk to which H.R.M.'s equipment was put must also be taken into account, however, and the risk in this situation appeared to be rather slight. No evidence was offered to show that H.R.M.'s risk of losing property was significant, and the short time necessary to complete the rescue and bring the Venture VII to a safe berth at Goat Island further suggests that the operation was relatively low-risk to the salvors. Whatever risk there was in this situation is present in every salvage case in similar weather conditions, and the ability of H.R.M.'s specialized equipment to withstand heavy weather has already been accounted for in this analysis. Therefore, consideration of the value of H.R.M.'s property value and the risk to it does not indicate the necessity of a liberal salvage award.

Nor were the members of the H.R.M. staff put to any unusual risk in rescuing the Venture VII. Anderson was able to complete his removal of the vessel from the rocks without a life preserver, and brought a friend along for the ride, although she was not an employee of H.R.M. These two factors certainly indicate that in Anderson's mind, at least, there was not substantial danger in the salvage operation. In addition, despite the wind conditions and choppiness of the seas, members of the H.R.M. staff were able to embark and debark between the vessels with apparent ease, indicating that the personal risk to them was not high. This factor does not weigh in favor of a liberal salvage award in this case.

■ The value of the property saved, the Venture VII and her equipment, is the object of considerable controversy. This controversy is exacerbated by the lack of two significant pieces of information on this record; (1) the price Ford actually paid for the vessel in 1995 and (2) some indication of what the Venture VII looks like. No photograph of the Venture VII as a whole was entered into evidence. Photographs of some of the damaged areas of the boat were admitted, but its overall appearance, either before or after the salvage, is left entirely to the court's imagination. To some extent, this lack of evidence must weigh against plaintiff, because plaintiff has the burden of persuasion on the value of the salved vessel. *Allseas Maritime,* 812 F.2d at 249; *citing Nolan v. A.H. Basse Rederiaktieselskab,* 267 F.2d 584, 589 (3d Cir.1959).

Certainly, in marine salvage cases, the opinion of a qualified marine surveyor is entitled to some weight, and the parties presented testimony from several qualified experts in this field. *See Compagnie Commerciale de Transport a Vapeur Francaise v. Charente Steamship Co.,* 60 F. 921, 923–24 (5th Cir.1893). The difficulty in determining this issue lies primarily in the wide divergence between the opinions offered by these experts. Mr. Eaton, who provided his opinion as to the value of the Venture VII when Ford purchased the boat in 1995, was called by the plaintiff salvage company and testified that her value was $495,000 at the time of the incident. Eaton consulted the "Buck Book," a widely recognized publication indexing the value of previously-owned boats, and compared the Venture VII's condition and equipment to those of similar vessels in determining the boat's value. In setting this value, he did not consider the value of property later removed from the Venture VII, including sails and other equipment, nor did he consider that Ford bought the vessel for an amount alleged to be considerably less than the value Eaton placed on her after he rendered his initial opinion. Plaintiff's alternate expert on the value of the Venture VII, Robert Daigle, substantially duplicated Eaton's analysis, and arrived at the same value for the vessel.

The defendants and third party defendants presented two expert marine surveyor witnesses who disagreed sharply with Eaton and Daigle on the value of the Venture VII. Both of these experts, William Gates and Michael Collyer, employed substantially the same methodology as the plaintiff's experts, but neither performed a survey until after the incident. The fact that these surveys were not completed until after the incident does not affect the weight these opinions should be given, because it is well settled that the vessel's post-incident value is the measure to be considered with regard to this factor in the *Blackwall* analysis. *Platoro, Ltd., Inc. v. Unidentified Remains of a Vessel*, 695 F.2d 893, 904 (5th Cir.1983) (post-incident value is important because one consideration in setting salvage award is benefit to the owner of the vessel). Both Gates and Collyer placed more emphasis on the market value given to the Venture VII in the "Buck Book" and comparisons with sale of similar boats than did the plaintiff's experts. Gates and Collyer therefore estimated the vessel's value at roughly $230,000 after the incident, allowing for her damaged condition and the equipment then on the vessel.

Faced with such different values for the Venture VII at the relevant time, this court must determine which value, the $495,000 figure proffered by the plaintiff's experts or the $230,000 figure provided by the defendants and third party defendants' experts, if either, rings more true. First, the surveys which resulted in these estimates of the boat's value were performed after the incident, when all the relevant facts could be known. Secondly, the surveys performed by Collyer and Gates placed more emphasis on objective criteria such as sales of comparable vessels and "Buck Book" values, rather than on subjective considerations; such as the "uniqueness" of a vessel proclaimed by one of plaintiff's experts to be "the queen of the fleet" of Mason cutters. Finally, while the actual amount for which Ford purchased the Venture VII is not in evidence, the plaintiff does not dispute that it was far less than the amount set for the vessel's value by the plaintiff's experts, or that how much the vessel had recently sold for is evidence of its value. Therefore, this court finds that the

Venture VII's post-salvage value was $250,-000.

■ The last of the *Blackwall* factors to be considered is the degree of danger from which the property was rescued. 77 U.S. at 14. Here, there can be little doubt that the Venture VII was in significant danger, although the evidence showed that the damage she sustained before the rescue was essentially superficial, rather than structural. The majority of the damage was to the keel, which had to have additional lead weight reapplied after it had been scraped off by contact with the rocks, and had to be re-epoxied. There was no evidence at trial that the Venture VII had been in imminent danger of holing and taking on water as a result of the damage it was sustaining. The evidence introduced at trial appears only in hindsight, however, and the apparent danger to the Venture VII at the time of the rescue is more appropriately considered. *Bureau Wijsmuller*, 702 F.2d at 340. No doubt exists that a vessel aground on rocks, rising and falling onto the rocks with each successive wave, at a minimum appears to be in imminent danger of breaking up or holing and taking on water. *Id.* at 338. H.R.M.'s salvors did not have the opportunity to gauge the ability of the Venture VII to resist the stresses of her situation for any length of time. Only the danger apparent then is relevant to the *Blackwall* analysis, and the danger then was apparently significant. *Id.* at 338, 340.

The defendants suggest that the apparent danger faced by the Venture VII was mitigated by the availability of other assistance than was provided by H.R.M. Defendants submitted no evidence which tended to prove this contention, other than that the assistant harbormaster on duty might have rendered assistance to the Venture VII if he had not been called away. Evidence of the assistant harbormaster's intention does not establish the availability of other assistance, however, and therefore does not give reason to find any mitigation of the danger the vessel faced. Therefore, this court finds both that the Venture VII was apparently in significant danger when H.R.M. personnel undertook to salvage

the vessel, and there was no other assistance at hand.

Taking into account the six *Blackwall* factors, and keeping in mind that professional salvors such as H.R.M. are due liberal salvage awards for their voluntary efforts on behalf of boat owners, this court finds that H.R.M. is due a salvage award in the amount of $25,000. The value of the property saved, the degree of danger to that property, and the promptitude, skill and energy of the salvors were all moderate to high in these circumstances. There was little labor expended in freeing the vessel and towing it to safety, however, and the value of the property put at risk to save the vessel and the degree of danger of losing the salvor's property were relatively low. Therefore, this was not a "high-order" salvage, involving extraordinary efforts or extreme risks to the salvors. An award in the amount of $25,000 provides a liberal bounty for the services provided under these circumstances.

B. Third-party claim for negligence against New York Yacht Club and Dunbar

■ The defendants/third-party plaintiffs claim that New York Yacht Club and Dunbar are responsible both for the amount of the salvage award and for the damage caused to the Venture VII by the breakaway. *See The Southport*, 190 F.2d 699 (4th Cir.1951) (failure of a mooring, that is, failure of a deadman, "creates an inference of negligence on the part of the defendant" owner). This claim sounds in negligence, as the third-party plaintiffs assert that NYYC and Dunbar breached a duty owed to Ford to "insure" that the mooring provided by them to boat owners is sufficient for the use to which the boat owner will put the mooring. *Manhattan Lighterage Corp. v. Moore–McCormack Line*, 45 F.Supp. 271 (E.D.N.Y.1940). NYYC and Dunbar deny either that the mooring was inadequate, or that they had any duty to insure against damage caused by failure of the mooring, whether it was adequate or not. Moreover, the third-party defendants assert that whatever role the mooring may have had in the Venture VII's breakaway, the defendants/third-party plaintiffs must lose on this claim, because Mur-

phy, as captain of the vessel and agent for the defendants, failed to properly inspect and use the mooring, and Murphy's failure was a superseding cause of the breakaway. *Exxon Co. v. Sofec*, —— U.S. ——, —— —— ——, 116 S.Ct. 1813, 1817–18, 135 L.Ed.2d 113 (1996) (superseding cause doctrine in maritime cases not displaced by comparative fault system announced in earlier case). In addition, third-party defendant NYYC claims it is immune to suit by Ford, because NYYC is a not-for-profit corporation of which Ford is a member. *See, e.g., Walsh v. Israel Couture Post*, 542 A.2d 1094 (R.I.1988), *Farrar v. Edgewood Yacht Club*, 111 R.I. 376, 302 A.2d 782 (1973). This court does not need to determine whether NYYC or Dunbar had any duty to provide a particular type of mooring, or is responsible to indemnify the defendants/third party plaintiffs for the damages, or decide whether NYYC's immunity argument holds water, because the third-party defendants are correct in their assertion that Murphy, as an inattentive agent for the third-party plaintiffs, proximately caused the breakaway. *See Exxon v. Sofec*, —— U.S. at ——, 116 S.Ct. at 1815 (proximate cause and superseding cause doctrines still apply in maritime cases).

Third-party plaintiffs point to the failure of NYYC and Dunbar to supply a line of a diameter in excess of 1", and a double line for securing the vessel, as required by Newport Harbor regulations, in support of their contention that the third-party defendants were responsible for the damages which resulted when the Venture VII broke away. *See The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873) *and The Limon*, 35 F.2d 730 (1st Cir.1929); Defendant's Exhibit D. "Newport Harbor Rules and Regulations." Third-party plaintiffs ignore two facts which are fatal to this line of reasoning, however: the third-party plaintiffs did not rely on the Newport Harbor regulations, and Murphy, as captain of the vessel was in the best and final position of all involved to gauge the ability of the line to hold the vessel during rough weather, and did nothing to improve upon what had been provided.

Murphy testified that he did not know what Newport Harbor regulations required

of a mooring used to secure a vessel of the length of the Venture VII. Therefore, the third-party plaintiffs could not have relied on this information, or the supposed compliance of NYYC and Dunbar, to their detriment. Evidence of NYYC and Dunbar's failure to meet the requirements of the regulations may tend to demonstrate their duty and breach of that duty, but it does not support the element of causation essential to the third-party plaintiffs' claims.

With respect to causation, as captain of the vessel, Murphy was in the best position to determine if the mooring line and chafing gear provided were sufficient to hold the vessel during heavy weather. Murphy claims he checked the line and gear every day and found them to be in acceptable condition. He further testified that if he knew that a second pennant line was attached to the buoy, he would have used it, a fatal admission. Murphy failed to explain, however, why he did not add chafing gear or a second line to the mooring, although these were available on the Venture VII, if he believed these to be necessary. If the chafing gear or line was inadequate, Murphy should have discovered this fact during the week the vessel was moored in Newport before the breakaway, and should have installed additional chafing gear or another line, or at least complained about the situation. Murphy, as agent of the third-party defendants for the purpose of securing and maintaining the vessel, must be charged with the responsibility of adequately securing the Venture VII, and his failure, not that of NYYC or Dunbar, was the cause of the breakaway under these circumstances. *See Exxon v. Sofec*, —— U.S. at ——, 116 S.Ct. at 1819 (plaintiff who the sole proximate cause of his own injury may not recover damages from other parties responsible for the damages as causes-in-fact). The third-party plaintiffs' claim must therefore fail.

This court finds for the plaintiff on its salvage claim and awards a salvage bounty in the amount of $25,000 against defendants. The plaintiffs are not awarded prejudgment interest on this bounty. This court finds for third-party defendants on defendants/third-party plaintiffs' claim for indemnity and dam-

ages. The plaintiff and third-party defendants will each submit an appropriate form of judgment within five days of this opinion. Each party will bear its own costs.