David R. **GREENLY**, Plaintiff, Appellant,

v.

**MARINER MANAGEMENT GROUP, INC., ET AL.,** Defendants, Appellees.

No. 99–1054.

United States Court of Appeals, First Circuit.

Submitted June 11, 1999.

Decided Sept. 21, 1999.

Michael X. Savasuk on brief, for appellant.

Robert J. Murphy and Holbrook & Murphy on brief, for appellees.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

This appeal arises out of the sinking of a 65–foot fishing trawler, the F/V MISS PENELOPE, off the Maine coast. The incident spawned a wrongful death claim on behalf of a crew member who was lost at sea, a bodily injury claim by an injured seaman, and a claim by plaintiff-appellant David Greenly (the owner of the vessel) for property damage. The defendants, Mariner Management Group, Inc. and Clarendon Insurance Co. (collectively, "Mariner" or "the insurer"),[1] paid the bulk of Greenly's claim but withheld $34,370 as a coinsurance penalty applicable to payments made to settle the seamen's claims under the protection and indemnity (P&I) provisions of Greenly's policy.

Asserting admiralty jurisdiction, see 28 U.S.C. § 1333(1), Greenly sued in the federal district court to recover the withheld amount. The case was heard on cross-motions for summary judgment. A magistrate judge recommended that judgment enter in Greenly's favor. Mariner objected. The district court disagreed with the magistrate's recommendation in relevant part, concluded that Mariner's position was well-taken, and granted its motion for brevis disposition. See Greenly v. Mariner Mgmt. Group, Inc., Civ. No. 98–130–P–H, slip op. (D.Me. Sept. 23, 1998) (unpublished). We reverse.

The essential facts are not in dispute. Greenly had fished the MISS PENELOPE out of Portland for several years prior to the mishap. Although he captained the vessel throughout that period, he decided to take an impromptu sabbatical in the fall of 1997. He appointed a member of the crew, Brian Morse, to serve as captain—an action that the policy allowed him to take without permission from, or notification to, the insurer. Morse's stint as captain was brief, for the vessel sank in heavy weather just a few months later. Of the four men aboard when she went down, one was lost and one was injured.

Greenly learned of the sinking on January 28, 1998, and immediately reported it to the insurer. Mariner balked at paying the wrongful death and bodily injury claims in full when it learned that four men were aboard the ship at the time of the accident. It cited the insurance policy's Crew Warranty clause, asserting that this clause contemplated a maximum of three crew members; and that, although the insured retained the right to add crew members, he could only assure full coverage by notifying the insurer before the fact and paying a premium surcharge, neither of which Greenly had done. Since the accident occurred with more than three men on board, Mariner reduced P&I pay-

---

1. Mariner functions as a general agent for Clarendon (the underwriter). For present purposes, it is unnecessary to distinguish between them.

ments in proportion to the ratio between what it considered to be the *stated* and *actual* number of crew members. It accomplished this reduction by withholding the calculated amount from the payment due to Greenly under the policy's first-party coverage on the vessel's hull and machinery.[2]

Coverage disputes usually depend upon the language of the policy, and this case is no different. The critical provision is the Crew Warranty clause, which provides:

> In consideration of the premium charged, it is warranted that coverage hereunder is provided for not more than *three (3)* crew members aboard the insured vessel at any one time. Also, warranted that in the event additional crew are to be covered hereunder, the Assured shall give prior notice to this Company and pay such additional premium as is required. If the Assured shall fail to give such prior notice and at the time of loss with respect to crew there are more crew on board, this insurance shall respond only in the proportion that the stated number of crew bears to the number on board at the time of the accident.

The key to interpreting this clause lies in the meaning of the word "crew." The protagonists read this word quite differently. On the one hand, Mariner maintains that the word is unambiguous and that its common meaning includes the entire complement of individuals working aboard a vessel in any capacity (e.g., ordinary seamen, deck hands, the cook, the engineer, the mate, the captain). On this reading, Mariner urged the district court to find that Morse (the captain) necessarily

comprised part of the crew, and that, therefore, his presence, together with that of three ordinary seamen, breached the warranty. Greenly, on the other hand, maintains that the word "crew" at the very least excludes the ship's captain. On this reading, he urged the district court to find that Morse (*qua* captain) did not comprise a part of the crew, and that, therefore, the warranty was fulfilled (i.e., the "crew" on board at the time of the sinking numbered three).

The magistrate judge essentially accepted Greenly's position. On de novo review, the district judge agreed with Greenly in the first instance; he found that the word "crew," in and of itself, was ambiguous. But this proved to be a Pyrrhic victory, for the judge went on to rule that, "[r]ead in its context, the crew warranty objectively manifests an intent to cover the captain as well as other members of the ship's crew." The district judge thereupon rejected the magistrate's recommendation, denied Greenly's motion for summary judgment, and granted Mariner's cross-motion.

■ We review the district court's entry of summary judgment de novo.[3] *See Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). Like the lower court, we focus on the narrow question of whether Captain Morse should be deemed a member of the crew for purposes of the Crew Warranty clause.

■ Our first step is to identify the body of law that guides our interpretative efforts. Although a court sitting in admiralty jurisdiction must apply federal mari-

---

**2.** The parties are in apparent agreement that, if Greenly breached the Crew Warranty clause, the insurer properly calculated the coinsurance penalty and justifiably implemented the setoff.

**3.** Once a court has determined that a material term in a contract is ambiguous, resolution of that ambiguity in some instances may require an assessment of extrinsic evidence of the parties' intent and thus become a question for

the factfinder, precluding summary judgment. *See, e.g., Fowler v. Boise Cascade Corp.*, 948 F.2d 49, 54 (1st Cir.1991). Here, however, the policy itself not only fails to resolve the ambiguity of the word "crew," but the inconclusive extracontractual evidence of the parties' intent also fails to generate a genuine issue of material fact. Therefore, we treat the dispositive issue as a question of law, engendering de novo review.

time rules that directly address the issues at hand, it may—and should—resort to state law when no federal rule covers a particular situation. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 320–21, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *Acadia Ins. Co. v. McNeil,* 116 F.3d 599, 603 (1st Cir.1997); *see also* Restatement (Second) of Conflict of Laws § 188 (1971). This is such a case. Thus, state law (here, Maine law) supplies the substantive rules of decision.

■ Maine's highest court has observed that the "paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in the light of all the circumstances under which it was made." *Whit Shaw Assocs. v. Wardwell,* 494 A.2d 1385, 1387 (Me.1985) (citation and internal quotation marks omitted). As is the case with other contracts, unambiguous provisions contained in insurance policies are to be interpreted as written, giving force to their plain meaning. *See Jack v. Tracy,* 722 A.2d 869, 871 (Me.1999). Nonetheless, some special rules apply to insurance policies. *See, e.g., Foundation for Blood Research v. St. Paul Marine & Fire Ins. Co.,* 730 A.2d 175, 180 (Me.1999) (reaffirming time-honored tenet that insurance policies are liberally construed in favor of the insured).

■ Ambiguous policy provisions present an area in which this liberality thrives. Insurance policies are contracts of adhesion, and amphibolous language is to be construed against the insurer and in favor of maximizing coverage. *See Foundation for Blood Research,* 730 A.2d at 180; *Geyerhahn v. United States Fid. & Guar. Co.,* 724 A.2d 1258, 1261 (Me.1999); *Johnson v. Allstate Ins. Co.,* 687 A.2d 642, 645 (Me.1997). Of course, an insurance policy is not considered ambiguous merely because a dispute arises over the meaning of a particular provision. If, however, an ordinary person would not understand, with some degree of assurance, that the provision has a single accepted meaning, ambiguity looms. *See Craig v. Barnes,* 710 A.2d 258, 261 (Me.1998); *Peerless Ins. Co. v. Brennon,* 564 A:2d 383, 386 (Me. 1989). Put another way, if the language used by the insurer is susceptible to two or more plausible but not functionally synonymous interpretations, then that language can be found ambiguous. *See Allen v. Adage, Inc.,* 967 F.2d 695, 700–01 (1st Cir. 1992); *Cambridge Mut. Fire Ins. Co. v. Vallee,* 687 A.2d 956, 957 (Me.1996).

■ In this instance, our review of the relevant policy language leads us to conclude that the Crew Warranty clause contains an ambiguity as to the captain's status. No less an authority than the Supreme Court observed some six decades ago that courts historically have been unable to attach "an absolutely unvarying legal significance" to the word "crew." *South Chicago Coal & Dock Co. v. Bassett,* 309 U.S. 251, 258, 60 S.Ct. 544, 84 L.Ed. 732 (1940). Moreover, the passage of time has done little to demystify the term.[4] *See, e.g., Tonnesen v. Yonkers Contracting Co.,* 82 F.3d 30, 33 (2d Cir.1996). Lexicographers have had no better luck at pinning down a single meaning for the word. *See, e.g.,* Black's Law Dictionary 334 (5th ed. 1979) ("'Crew' does not have an absolutely unvarying legal significance or any well-defined factual significance."); Funk and Wagnalls New Standard Dictionary of the English Language (1934) (defining "crew" as "[t]he company of seamen belonging to one ship or boat: sometimes including officers"); Webster's Tenth New Collegiate Dictionary 274 (10th ed.1993) (defining "crew" as "[t]he whole company belonging to a ship sometimes including the officers and master").

---

4. Of course, the policy documents could have defined the term "crew," but the insurer es-

chewed that simple expedient.

The demonstrated malleability of the word "crew" renders the precise meaning of the Crew Warranty clause uncertain. While it leaves room for the insurer's interpretation—that, by operation of the clause, the insured warrants that the vessel will be manned by a company of three, counting the captain—it makes equally plausible the insured's interpretation—that, by operation of the clause, the insured warrants that the vessel will be manned by a company of three, not counting the captain.

The district court believed that in this instance context removed the latent uncertainty and gave a singular meaning to the otherwise ambiguous term. In this vein, the court pointed principally to the policy's P&I coverage, noting that the owner would have an additional exposure to liability for maintenance and cure or for Jones Act damages to a non-owner captain, and that this fact "would thus be within the parties' contemplation when contracting for P&I coverage." The gist of the district court's conception—with which we agree—is that the insurance company, from a risk and premium standpoint, probably envisioned that it was insuring three, not four, persons serving the vessel, and would have wanted higher premiums for a fourth such person (whether an ordinary seaman or a non-owner captain).

■ There is some further albeit thin support for this view, urged by the insurer, in the language of the binder that preceded the policy's issuance. Without going into detail, this language can be read as juxtaposing the premium to be charged with the proposition that the coverage is for three crew members, excluding the captain (because he is an owner). However, the policy itself did not incorporate that language, and the terms contained in a binder only regulate coverage until the actual policy issues (at which time they are supplanted by the terms of the policy). *See* 1 Couch on Insurance 3d § 13:1 (1997); *see also United States Fire Ins. Co. v. Producciones Padosa, Inc.*, 835 F.2d 950,

956 (1st Cir.1987). While the fact that the policy supersedes the binder does not necessarily render the binder irrelevant in construing ambiguous 'policy wording, the binder itself is not crystal clear and the omission of the language to which Mariner points can easily be taken to mean that the parties rejected the notion.

■ Although the question is close, we reject the district court's analysis. Admittedly, a knowledgeable insurer might reasonably take the policy as intending to provide coverage for injury as to three individuals—and three individuals only—aboard the vessel. But a lay person would have no reason to share this perspective—and the fact remains that the term "crew," both in general usage and in the context of this particular policy, is patently ambiguous. In parsing insurance policies, Maine courts must scrutinize policy language "from the perspective of an average person, untrained in the law or the insurance field, in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Peerless Ins. Co. v. Wood*, 685 A.2d 1173, 1174 (Me.1996). Here, the insured reasonably could have thought that a non-owner captain was not considered part of the crew, and that he was fully protected despite the introduction of a new captain.

■ Accordingly, this case is governed by the well-settled rule that, in doubtful situations involving genuine ambiguities, policy language is to be construed against the insurer (who drafted the policy and thus could have avoided the ambiguity) and in favor of maximizing coverage. *See Foundation for Blood Research*, 730 A.2d at 180; *Geyerhahn*, 724 A.2d at 1261; *Wood*, 685 A.2d at 1174. We believe this canon carries decretory significance in the instant case—a case in which a policy term that controls the extent of the insured's coverage is both ambiguous and reasonably susceptible to alternative interpretations.

We need go no further. We conclude that the policy contains an inherently ambiguous term. Because we find the insured's interpretation of this term as plausible as the insurer's, we see no principled basis for departing from the default rule that requires courts to resolve such ambiguities in favor of coverage. Consequently, we reverse the judgment of the district court.

*Reversed.*