**NEW BEDFORD MARINE RESCUE, INC., Plaintiff,**

v.

**CAPE JEWELER'S INC., Defendant.**

**No. CIV.A. 01CV11450MBB.**

United States District Court,
D. Massachusetts.

Jan. 21, 2003.

John E. Sutherland, Brickley, Sears & Sorett, Angela H. Magary, Brickley, Sears & Sorett, P.A., Boston, MA, for New Bedford Marine Rescue, Inc., Plaintiff.

Michael J. Calabro, Flanagan & Hunter, P.C., Brian P. Flanagan, Flanagan & Hunter, Boston, MA, for Cape Jeweler's Inc., Defendant.

## MEMORANDUM AND ORDER

BOWLER, Chief United States Magistrate Judge.

Plaintiff New Bedford Marine Rescue, Inc. ("plaintiff"), a Massachusetts corporation with a principal place of business in New Bedford, Massachusetts, filed this admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure ("Rule 9(h)") against defendant Cape Jeweler's Inc. ("defendant"), a Massachusetts corporation with a principal place of business in Norwood, Massachusetts and the owner the M/V Memories ("the Memories").

Plaintiff asserts that the service it rendered was a salvage[1] service of a high order of merit and, but for this service, defendant's vessel, the Memories, would have suffered a substantial loss. Plaintiff argues that the service was prompt, efficient, successful and required a high degree of skill.

Defendant contends that plaintiff's salvage claim is barred because of the lack of any marine peril to defendant's vessel due to the fact that the vessel was secured to its berth at all relevant times and in no further danger from the sea or the elements. Defendant also filed a counterclaim against plaintiff for unfair and deceptive trade practices under Massachusetts General Laws chapter 93A ("chapter 93A"). Defendant asserts that plaintiff is attempting to fraudulently establish a salvage claim.

This case was tried by consent to this court without a jury pursuant to 28 U.S.C. § 636(c). The following witnesses testified during the one and a half day trial:

---

1. There are two types of salvages, a contract salvage and a pure salvage. A "contract salvage is that type of salvage service entered into between the salvor and the owners of the imperiled property, or by their respective representatives, pursuant to an agreement, written or oral, fixing the amount of compensation to be paid whether successful or unsuccessful in the enterprise." 3A Martin J. Norris, *Benedict on Admiralty* § 159 (2002). In contrast, pure salvage is "[a] voluntary service rendered to imperiled property on navigable waters where compensation is dependent upon success, without prior agreement or arrangement having been made regarding the salvor's compensation." 3A Martin J. Norris, *Benedict on Admiralty* § 159 (2002) (internal quotation marks omitted).

(1) George Gray ("Gray"), a certified master diver working part time for plaintiff on an "on call" basis; [2]

(2) Ralph Joseph ("Joseph"), the owner of New Bedford Marine Rescue, Inc. which started as a small rescue and salvage company in 1995; [3]

(3) Martin Niemiec ("Niemiec"), the owner of Niemiec Marine and Boat in New Bedford; [4] and

(4) Shawn Keegan ("Keegan"), the owner of Cape Jeweler's Inc. and principal operator of the Memories. [5]

The Memories is docked at the marina, approximately 200 to 300 feet from Gray's houseboat. It is a Canyon 30 vessel, custom made on Cape Cod. The hull specifications list the freeboard forward of the Memories at 4.6 feet and the freeboard aft at three feet. [6] At the berth where the Memories is docked, the water level at low tide is approximately six feet. [7] The tidal range at this location is about 3.7 to 3.8 feet.

The marina does not offer any security services such as a watchman, nor did Gray act in the capacity as a watchman for the marina. The contract between Keegan and the marina states that the owner is fully responsible for any damage to his boat.

### The Event

On October 25, 2000, in the late afternoon, Gray was in his houseboat when a man, who also owns a boat at the marina, came to see him. In response to this visit, Gray walked down to the Memories to observe the vessel and assess whether or not it was in any trouble. Gray testified

---

2. At the time of the incident, he owned and resided year-round on a houseboat docked at the Seaport Marina ("the marina").

3. The company obtains work by monitoring the very high frequency ("VHF") radios as well as telephone calls directly from boat owners, insurance companies, people witnessing accidents and the Coast Guard. Joseph began the business with one commercial boat modified with a larger engine and towing bit to accommodate the needs of a rescue and salvage company. Currently, Joseph has three boats in full operation with one additional boat under construction. Joseph has other equipment for towing and salvage services such as 600 feet of tow line, shackles, bridles, two VHF radios, a first aid kit, life jackets, towing lights and a towing marker flag.

Joseph is not a member in any professional organization but he is certified as accredited for commercial assistance and professional towing ("ACAPT"). Joseph and his crew have undergone training through the Coast Guard. Joseph employs nine captains who are all trained in cardiopulmonary resuscitation ("CPR") and first aid and some are also emergency medical technicians. To become a captain, one must take an exam administered by the Coast Guard. One must be well versed in navigation, weather, and deck safety to successfully pass the test. Joseph also employs a registered nurse and Gray.

4. Niemiec's business is a full service boat yard providing repair to boats ranging 30 to 60 feet in length. The business has been located on Polk's Island in New Bedford for the past 14 years and had previously been at another location for ten years

5. The Memories was purchased by Keegan's father in the early 1990's. Keegan has owned the boat for eight or nine years and operates it approximately three dozen times a year.

6. Freeboard is "the portion of the side of a hull that is above the water." *The Random House College Dictionary* (1980); *see e.g. TAG/ ICIB Servs., Inc. v. Pan American Grain Co., Inc.*, 215 F.3d 172, 174 (1st Cir.2000); *Greenly v. Mariner Management Group, Inc.*, 192 F.3d 22, 26 (1st Cir.1999) (using dictionary definitions).

7. Keegan disputes the fact that the water level at low tide is six feet. Keegan testified that he believes it to be shallower. He gave no indication, however, as to what he believes the water level to be nor did he testify to ever measuring the water level.

that when he first saw the boat, the stern was down to the point where the water was starting to lap at the scuppers.[8] Gray determined that the boat needed immediate attention and went back to his houseboat to get an electric pump and absorbent pads.

Gray stated that he was unsure of the origin of the particular absorbent pads because they are usually replenished by whoever needs and uses them. In the past, however, they have been supplied by plaintiff. The electric pump and other equipment Gray had available on his boat were to use in case of an emergency when Gray would work in the capacity of an employee for plaintiff.[9]

Gray then went back to the Memories and proceeded to unplug the shore power from the boat. The shore power is 110 volts of electricity and can be lethal if not unplugged before boarding a boat containing water. Although there is also 12 volts of electricity on board, a shock from 12 volts would only cause discomfort. Once Gray boarded the Memories, he brought the pump into the engine compartment located below the deck hatch[10] and plugged the pump into the pedestal.[11]

Gray testified that at this time, the base of the engine was submerged but the water had not reached the engine starters located near the bottom of the engine. Gray then positioned the pump with the overflow from the draw hose pointed overboard and placed absorbent pads inside the engine compartment to soak up the oil.

Gray testified that utilizing absorbent pads to soak up oil is a common practice because it prevents environmental problems such as oil spilling into the water outside the vessel. He also stated that it is common to see oil floating on the surface of the water inside a boat, whether it is fuel in origin or oil residue. Gray testified, however, that the Memories had more than an average amount of oil in the bilge indicating to him that the vessel was not well kept.

After he began pumping the water out of the boat, Gray telephoned Joseph for assistance because he knew he should not try to salvage a boat by himself in the event that something went wrong. Gray testified that he decided to call Joseph because Joseph is experienced in salvaging boats and he thought Joseph would be better informed about how to proceed. Furthermore, if the boat needed to be hauled out of the water, Joseph could provide that service. Gray or someone directed by Gray then telephoned the marina's manager to obtain contact information for the Memories' owner in order to inform him that the boat was taking on water.

Joseph arrived at the scene by boat about 15 minutes after speaking with Gray on the telephone. Joseph came aboard the Memories and assessed the situation. He noticed Gray was gaining on the water in the boat and therefore felt it unnecessary to bring another pump on board. Joseph then plugged the scuppers with rags in the event the water line rose up to the scup-

---

8. Scuppers are "drain[s] at the edge of a deck exposed to the weather, for allowing accumulated water to drain away into the sea or into the bilges." *The Random House College Dictionary* (1980).

9. The other equipment Gray had on his houseboat included a generator, small wind up electric generators, lines, fenders and diving gear.

10. Gray testified that the deck hatch is located in the cockpit sole between the transom and the helm in the stern of the boat. The deck hatch was not locked.

11. Every boat is made with a pedestal which provides electricity to the boat without being plugged in at the dock.

pers. He also noticed a slight sheen from the discharge of the pump accumulating outside of the boat so he placed several absorbent pads on the water and successfully absorbed the oil.

Joseph also assisted Gray several times in rearranging the pump to position it in the lower part of the bilge. Additionally, Joseph was constantly arranging and placing new absorbent pads inside the boat to soak up the excessive oil. They used approximately 33 absorbent pads during the operation.[12] Gray testified that pumping out the boat required about one half hour to an hour once Joseph arrived on the scene.

In the meantime, the general manager of the hotel at the marina approached Joseph with the contact information for the owner of the Memories. She handed Joseph a card with Keegan's contact information including a cellular telephone number as well as a second telephone number. Joseph proceeded to telephone Keegan and inform him that his boat was taking on water and there was a considerable amount of water already in the boat. Joseph testified that he told Keegan he felt it was a salvage situation, there was a pump on board pumping out water, and the boat was on the brink of stabilization.

Keegan initially disagreed with Joseph and Gray being on his boat. Joseph replied that he would be happy to take the plugs out of the scuppers and remove his pump and personnel, but emphasized that Kee-

gan needed to call someone to repair the leak because the boat was in peril. Keegan responded stating he would call his mechanic but, significantly, Keegan asked Joseph to stay with the Memories and not to let it sink. They also spoke about the possibility of hauling the boat out of the water and Keegan informed Joseph that he did not want the boat taken out of the water if at all possible.

Keegan disputes the content of the telephone conversation with Joseph. Keegan maintains he did not ask Joseph to stay and, instead, asked him to leave because Keegan was going to call his mechanic. This court finds Joseph's testimony more credible due to the subsequent facts testified to by both Keegan and Joseph.[13]

After the telephone call with Keegan, Joseph determined that the source of the flooding was from leaking in the stuffing boxes.[14] At the same time, Keegan telephoned Niemiec, his mechanic, and asked him to go over to the boat, secure it, and see if the boat was in trouble. Niemiec arrived by boat with one of his employees, David Matuse ("Matuse"), approximately 15 minutes after speaking with Keegan. Joseph testified that Niemiec brought only tools with him and no additional pumps.

Joseph informed Niemiec that the source of the leak was coming from the stuffing boxes so Matuse took a wrench, opened the engine hatch, went down into the area of the propeller shaft and tight-

---

12. Each absorbent pad cost one dollar.

13. These facts, as discussed *infra,* include Niemiec's testimony that he asked Joseph to take out a spoon when Joseph and Gray were finished pumping so that the bilge pumps did not burn out. Additionally, Niemiec telephoned Keegan once he had repaired the stuffing boxes and yet Keegan said nothing about the fact that Joseph was still on board. Had Keegan not wanted Joseph and Gray to continue their work, it would seem likely that

Niemiec would have asked them to leave instead of inferring that they were to stay until the bilge pumps had finished pumping the rest of the water out of the boat.

14. A stuffing box is "a device for preventing leakage of gases or liquids along a moving rod or [propeller] shaft at the point at which it leaves an enclosed space." *The Random House College Dictionary* (1980).

ened the stuffing boxes. Niemiec testified that the engine compartment only had about two to three inches of water.[15] He also stated that the leaking from the stuffing boxes was not severe, only a little more than stuffing boxes normally leak. In his experience, a small amount of water must leak from the stuffing boxes to keep them from overheating and burning out.

■ Niemiec then proceeded to telephone Keegan and let him know that he had temporarily fixed the problem and the boat was not in danger. At this time, Joseph also spoke with Keegan to tell him that his boat was secure. Joseph questioned Keegan for information regarding insurance, the insurance agent's name and to verify that Keegan was the owner of the boat. Keegan testified that Joseph also spoke to him about the cost of plaintiff's work. He testified that although Joseph never gave him an exact amount, Joseph said it would be minimal and explained to Keegan how much it costs per foot to pump out water that had not yet reached the gunnels. Joseph testified that he never spoke to Keegan about the cost of his services.[16]

Once Joseph was off the telephone, Niemiec temporarily fixed the forward bilge pump switch to keep the bilge pump running by propping it up with a plastic spoon. The forward bilge pump had not turned on automatically and Keegan testified to having trouble in the past with the

bilge pumps not turning on automatically. Niemiec asked either Gray or Joseph to remove the plastic spoon when the water was completely pumped from the forward bilge. Niemiec testified that the boat's aft pump was operating at this time but later acknowledged that the noise he heard could have been attributed to the pump brought by Gray still operating in the engine compartment. Both Joseph and Gray testified that neither the aft nor the forward bilge pumps was operating. Niemiec was aboard the Memories for approximately 20 minutes and later billed Keegan in the amount of $41.25 for his work.

After Niemiec left, Joseph and Gray continued to pump out water. Gray stayed on the scene for the better part of an hour. Once the water had been pumped out of the boat by both the electric pump supplied by Gray and the automatic forward bilge pump operating on the boat, Joseph removed the spoon to shut off the bilge pump. Gray then went back to his houseboat to obtain a camera in order to take three pictures of the scene. Gray testified that it is plaintiff's policy to take pictures of the scene for two reasons: the first is to document the vessel's problems for the owner and the insurance company; the second is to ensure there is documentation of their work immediately after completing the work.

Pictures A and C in plaintiff's exhibit one depict the level of water in the engine

---

**15.** The amount of water that was in the boat is also a disputed issue. The pictures suggest there was more water in the boat than testified to by Niemiec. Additionally, Gray had already been pumping water out of the boat for approximately 30 minutes before Niemiec arrived which would contribute to the difference in the water level.

**16.** For the defendant to rely on a contract to defeat a salvage claim, it must be pleaded as an affirmative defense. 3A Martin J. Norris, *Benedict on Admiralty* § 161. Furthermore,

the defendant has the burden to prove the existence of the contract. *See* 3A Martin J. Norris, *Benedict on Admiralty* § 162. Defendant's memorandum makes no argument that this was a contract salvage instead of a pure salvage claim. No additional evidence has been admitted on this point except for the alleged conversation between Keegan and Joseph. Additionally, Keegan admits that Joseph never offered Keegan a price for his services, which suggests there was no contract between the parties.

room apparent by the residue left from the oil at the surface of the water. Joseph testified that the pictures show the water was up to the level of the starters in the engine room and also demonstrate the excessive petroleum in the bilges which Joseph described as being "quite a mess." Gray took picture B in plaintiff's exhibit one to show the stains on the side of the cabin also made by the oil on the surface of the water. This picture exhibits the level of the water in the cabin when Gray first boarded the boat. Joseph testified that the picture showed the water level to be at least a foot above the floorboards. Once the pictures were taken, Joseph and Gray packed up the equipment and went back to their respective places. When Gray returned to his houseboat, he cleaned the pump in a five gallon pail by cycling soapy water through the pump.

The following weekend, Keegan went to the dock and cleaned up his boat. Keegan testified that when he returned to his boat, he noticed some debris in the back of the Memories but could not say whether they were absorbent pads or something else. He did recall that the water level depicted in picture B of plaintiff's exhibit one was accurate. Keegan did not believe that the engine room pictures accurately depicted what he observed the following weekend. He believed the engine room was not as dark as the pictures depicted it to be.[17]

### Damages

Following the incident, Joseph sent an invoice in the amount of $13,750 by certified mail to Keegan at three different addresses. Keegan refused these invoices on all three occasions. The invoice reflects the percentage of the value of the property after completing the salvage plus a bonus for the prevention of an oil spill. Joseph testified that the fair market value of the vessel post salvage was 100% minus the cost for the clean up Keegan performed the following weekend. Joseph calculated the cost by taking approximately 16% or 17% of the salvage value and adding 50% above that amount for the oil spill prevention.[18]

A number of the factors associated with a salvage operation are the dangers involved, the required knowledge of the salvors and whether the work was done voluntarily. The risk of this operation was slight although there were several dangers involved. The first danger is the risk of electric shock or electrocution that was avoided because Gray knew to unplug the shore power from the boat before proceeding. Joseph and Gray were also in contact with petroleum products and any carcinogenic properties associated with them. There is also the risk of boarding a boat that may be unstable because it is in danger of sinking.

The knowledge and skill required for such an operation includes knowledge of boat construction, pumps and how to remove water from a vessel. In addition, one must be aware of the risk of an oil spill and be knowledgeable of the wiring systems. Neither Joseph nor Gray were contracted by Keegan to do this work. Rather, they acted voluntarily in all of their efforts.

Niemiec testified that the boat would have taken at least three to four days to sink, even if the pumps that should auto-

---

17. The bilge could have been dry by the time Keegan arrived at his boat the following weekend, which would account for the difference in the darkness of the pictures and Keegan's recollection.

18. The calculation for salvage services is not an exact science and Joseph does not remember the exact figures used to calculate the invoice.

matically turn on when water is detected, were not working. Additionally, defendant stressed that the boat was tied up to the dock at all times. Gray testified that in his experience the boat would not have survived the night. An excessive amount of water had already accumulated in the boat within the prior 24 hours. Keegan had used his boat the previous day in the late afternoon and had not noticed a leak. Therefore, Gray believed that when the water level reached the scuppers, the boat could potentially sink within the hour.

Joseph and Gray testified that if the boat had sunk, the oil from the engine would have come out through the bleachers and floated to the surface, causing a serious environmental problem.[19] Additionally, anything that was not secured to the boat would have floated up. Gray testified that in all likelihood the electronics, the starter motor and the alternator would have needed to be replaced. The engine would have needed to be flushed at the least, if not replaced, and there would be cosmetic and upholstery damage. Gray also believed that the wood would probably have been warped and grown mildew before Keegan could dry it out, which would have caused a terrible aroma in the boat.

A petroleum spill must be contained and necessitates a clean up. Joseph uses Frank Corporation, a contractor in the harbor, to clean up petroleum spills. If a gasoline spill occurs, the spill is not usually contained because there is a rapid dissipation rate for gasoline. The Coast Guard or the Environmental Protection Agency ("EPA"), however, may require the party causing the spill to boom off a gasoline spill depending upon the situation and the individual who supervises the operation.

### Value of the Boat

Keegan told Joseph over the telephone that the boat was insured for $55,000 to $60,000. Joseph stated that in his experience, a custom boat such as the Memories is valued at $60,000 or more and he believed Keegan underinsured his boat. Niemiec testified that the boat was valued at only $25,000 in the year 2000. Niemiec has done extensive work on the boat since this event, amounting to a total bill of $35,000. Keegan described the condition of the Memories at the time of the event as "tired" and in poor to fair condition. On the other hand, he stated at a previous deposition that the boat's fair market value was $60,000. After he was reminded of his deposition testimony, Keegan admitted to stating at his deposition that the value of the Memories as a trade in was $60,000.

Keegan also stated during the deposition, however, that the trade-in value was probably exaggerated because the dealer would also be getting the sale of a new boat and that probably he would not get $60,000 if he were selling it to a third party. This court finds it is more credible to believe the vessel is valued at around $60,000.

### DISCUSSION

Plaintiff filed this admiralty and maritime claim against defendant within the meaning of Rule 9(h). This court will first address whether plaintiff established the elements for a pure salvage claim. This court will then address the amount of the award, if any.

**19.** Joseph testified that a custom boat such as Keegan's can hold up to 300 gallons of fuel, plus 12 quarts of oil per side per engine. Joseph admits that he does not know the exact amount of fuel that Keegan's boat contained on October 25, 2000. Keegan testified that the fuel tanks were low, that there was only 50 gallons of fuel between the two of them.

I. *Entitlement to Salvage Award*

 Plaintiff must prove three elements in order to establish a valid salvage claim: "1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success." *the SABINE,* 101 U.S. 384, 384, 11 Otto 384, 25 L.Ed. 982 (1879).

A. *Marine Peril*

 Marine peril exists when the vessel is in a situation that might expose it to loss or destruction at the time the services are rendered. *Fine v. Rockwood,* 895 F.Supp. 306, 309 (S.D.Fla.1995). A salvor need only reasonably apprehend a danger to the ship to constitute marine peril. *See Faneuil Advisors, Inc. v. O/S Sea Hawk,* 50 F.3d 88, 92 (1st Cir.1995). Additionally, "the threat to a vessel does not need to be imminent; it must only be probable that the vessel will be damaged or destroyed without intervention." *United States v. Ex–USS CABOT/DEDALO,* 179 F.Supp.2d 697, 709 (S.D.Tex.2000), *rev'd on other grounds,* 297 F.3d 378 (5th Cir. 2002). This court finds that the Memories was in marine peril.

According to the evidence, Gray believed the vessel was in danger of sinking when he commenced the salvage services. He testified that the water level was almost up to the scuppers. This testimony is supported by picture B of plaintiff's exhibit one which shows the water level in the cabin was at least a foot and a half above the floorboard. Gray also testified that there was a substantial amount of water in the engine room although it had not yet reached the engine starters. This is supported by pictures A and C of plaintiff's exhibit one. Keegan admitted picture B of plaintiff's exhibit one correctly reflected the condition of the cabin when he observed it the following weekend.

Defendant argues there was no danger of the vessel sinking because the boat was tied to the dock at all times and under the control of its owner and the marina. According to Gray and Keegan's testimony, the marina does not employ a watchman or security guard to watch over the boats. Their testimony is supported by Keegan's contract with the marina stating that the marina is not liable for the care and protection of the boat or any damages incurred by the boat. Therefore, the marina had no control over the boat. The evidence also shows that Keegan was at work when the boat was in peril and therefore could not have been in control of the boat at the time the salvage services were rendered.

Defendant focuses on two cases to support the notion that when a boat is tied to the dock, it is not considered in a marine peril. Both of these cases, however, can be distinguished from the case at bar and therefore are not controlling. In *Clifford v. M/V Islander,* 751 F.2d 1, 5 (1st Cir. 1984), the court held that Clifford did not establish a marine peril in order to collect an award for his salvage services. The court reasoned that by the time Clifford arrived on the scene, the boat was no longer in danger of sinking and therefore not in marine peril. *Clifford,* 751 F.2d at 6. *Clifford* is distinguishable from the case at bar because the Memories was sinking when Gray arrived on the scene.

The defense also refers to *Fine,* 895 F.Supp. at 310, where the court found no marine peril because the vessel was tied to the dock and settling on the channel bottom. This case is also distinguishable from the case at bar because the Memories was not settling on the channel bottom. To the contrary, the Memories was sinking when Gray arrived and the channel bottom

was still several feet below thereby allowing the boat to sink further.

Joseph testified that the depth of the water at Keegan's particular berth during low tide is in excess of six feet. He further stated he had measured the depth at one time because of the frequent visits to that marina. Keegan testified that the depth of water at his slip was five to six feet. Later in his testimony, however, he states that the depth of the water at his slip was not six feet but less than six feet. Keegan did not suggest he had ever measured the depth of the water. Therefore, this court finds the water depth at Keegan's berth was at least six feet.

Additionally, Joseph testified that the tidal range at Keegan's berth was approximately 3.7 to 3.8 feet. Keegan agreed that the tidal range was about four feet. Defendant's exhibit B describes the specifications for the Memories. The hull specifications list the draft [20] of the Memories at two feet, three inches. It also lists the freeboard aft as three feet. These factors taken together suggest that the vessel was in danger of becoming submerged and was not settling on the channel bottom. This court finds the vessel was in danger of sinking at the time Gray commenced the salvage services. The further submersion of the boat could have resulted in complete loss or destruction to the vessel. Gray's apprehension of danger to the vessel was reasonable in light of the circumstances and therefore the boat was in marine peril.

Defendant contends that marine peril cannot be founded solely on the basis of potential pollution to the marine environment. This court need not address this argument because this court finds a separate basis for marine peril. Nonetheless, as defendant admits in his brief, the pollu-

tion element is relevant when determining the salvage award and will be further discussed in the award section of this opinion.

### B. Service Voluntarily Rendered

 The next element the plaintiff must prove is that he voluntarily rendered the salvage service when he was not required to do so as an existing duty or from a special contract. the SABINE, 101 U.S. at 384, 11 Otto 384. It is well established that professional salvors responding to the aid of a vessel are voluntarily rendering their services regardless of their purpose for monetary gain. B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 339 (2d Cir.1983); 3A Martin J. Norris, Benedict on Admiralty § 81. Therefore, as long as there was no contract between Keegan and Joseph to render these services, the services were voluntary.

Joseph testified to voluntarily rendering the salvage services and that there was no contract between himself and defendant. He testified that when the salvage services began, his focus was on saving the vessel and no discussion of payment with Keegan occurred. Keegan alluded to a contract in his testimony when he stated he spoke with Joseph about the cost of the salvage work. Keegan admitted, however, he could not recall the amount per foot it would cost to remove water from the boat and Joseph never quoted a specific price. This court finds Joseph's testimony more credible because the evidence did not sufficiently show the conversation took place and defendant did not raise the contract argument.

 Defendant contends the offer of assistance was refused once Joseph contacted Keegan informing him of the ser-

---

**20.** Draft is "the depth to which a vessel is immersed when bearing a given load." The

Random House College Dictionary (1980).

vices being performed. He also argues that Gray should have contacted the owner to get permission before beginning to pump water out of the boat. Defendant is correct in asserting that salvage services cannot be forced on an owner of a vessel. *The Choteau*, 9 F. 211, (C.C.E.D.La.1881). As previously noted, however, Joseph's testimony regarding Keegan's alleged refusal is more credible than Keegan's testimony. Keegan testified that he asked Joseph to get off of his boat because he was calling his mechanic. Joseph admitted that Keegan's initial reaction was to ask Joseph to get off of his boat. When Joseph said he would be happy to stop rendering assistance, however, Keegan relented and asked Joseph to stay on the boat and "not to let it sink." Joseph's testimony is more credible based on several factors.

Joseph spoke with Keegan during a subsequent telephone call to inform him that his boat was secure. During this conversation, they conversed about the vessel's owner, the name of the vessel's insurer and other related topics. This suggests that Keegan was aware not only that Joseph continued to render services, but that Keegan or his insurance company would be responsible for the work. At this time Keegan also spoke with Niemiec on the telephone. When Niemiec was leaving, he asked Joseph or Gray to remove the spoon that was keeping the bilge pumps running, inferring that he expected them to stay until the water was completely pumped out of the boat. It seems implausible that Niemiec, after speaking with Keegan on the telephone, would then infer that Joseph and Gray were to stay until the water was pumped out of the boat if Keegan had actually asked Joseph to leave.

 It is unnecessary for a salvor to get permission from an owner before commencing salvage services as long as a prudent man would have accepted the services. *Merritt & Chapman Derrick & Wrecking Co. v. United States*, 274 U.S. 611, 613, 47 S.Ct. 663, 71 L.Ed. 1232 (1927). When a vessel has been temporarily left and it is in marine peril, a salvor who in good faith begins salvage services is not an intervener or trespasser. *See Rickard v. Pringle*, 293 F.Supp. 981, 984 (E.D.N.Y.1968) (quoting 3A Martin J. Norris, *Benedict on Admiralty* § 136). The facts show Gray requested the owner's contact information from the marina as quickly as reasonably expected once beginning the salvage services. This court finds Joseph's services were voluntarily rendered and that Keegan did not refuse Joseph's assistance in rendering those services.

### C. Success In Whole or In Part

 The final element the plaintiff must prove in order to establish a valid salvage claim is that the services rendered were successful in whole or in part, or that the services rendered contributed to such success. *The SABINE*, 101 U.S. at 384, 11 Otto 384. Plaintiff establishes this element through Joseph's testimony and the testimony of defendant's mechanic.

The boat was no longer in danger of sinking once enough water had been removed to where the mechanic could tighten the leaking stuffing boxes. After their salvage work was complete, the vessel did not need any significant repairs except for a cleaning. The cleaning consisted of washing the vessel with soap and water and re-oiling the wood.

Joseph testified that the fair market value of the vessel post salvage was 100 percent minus the cost of clean up. Niemiec also testified that there was no damage to the vessel from the flooding and Niemiec's subsequent work on the vessel was elective work unrelated to the incident. Addition-

ally, Keegan testified that the value of the vessel was the same before and after the incident inferring that the vessel did not incur any damage. The testimony is clear that the services rendered by Joseph and Gray were successful, the boat did not sink and the damage to the boat was minimal. This court finds that the salvors were successful in rendering their salvage services.

 Based on the conclusions above, this court finds that plaintiff has established a valid salvage claim and is therefore entitled to a pure salvage award.

II. *Calculating the Salvage Award*

 Once a valid salvage claim is established, the court must determine the amount the salvors should be awarded for their services. In determining a fair salvage reward, it is difficult to rely on precedent because salvage cases are seldom alike. *B.V. Bureau Wijsmuller,* 702 F.2d at 339; 3A Martin J. Norris, *Benedict on Admiralty* § 239. It is also widely recognized that a court should not use fixed percentages in determining a fair salvage award. *B.V. Bureau Wijsmuller,* 702 F.2d at 339; 3A Martin J. Norris, *Benedict on Admiralty* § 240. Moreover, there is no precise formula utilized by courts to determine the salvage award. Instead, the award must be calculated on a fact-specific basis. *Allseas Maritime v. M/V Mimosa,* 812 F.2d 243, 246 (5th Cir.1987).

 A salvage award should be liberal, based not only on services rendered, but on the notion that salvors should receive a bounty in order to encourage others to help vessels that are in distress. *The J.C. Pfluger,* 109 F. 93, 95 (N.D.Cal. 1901). Therefore, the award should not be computed based on a quantum meruit principle but rather as a reward. *The Blackwall,* 77 U.S. 1, 14, 10 Wall. 1, 19 L.Ed. 870 (1869). Finally, in calculating the award, it should be noted that a more

liberal award is granted when the salvors are professionals instead of once in a lifetime salvors. *B.V. Bureau Wijsmuller,* 702 F.2d at 340. Professional salvors are granted more liberal awards because they possess unique skills and must maintain expensive equipment to continue rendering services to those in need. *B.V. Bureau Wijsmuller,* 702 F.2d at 340.

 Since 1869, the well settled law outlines six factors in analyzing the calculation for a salvage award. *See The Blackwall,* 77 U.S. at 13–14, 10 Wall. 1.

These factors are listed in descending order of importance:

1. The degree of danger from which the ship was rescued;

2. The post-casualty value of the property saved;

3. The risk incurred in saving the property from impending peril;

4. The promptitude, skill, and energy displayed in rendering the salvage services;

5. The value of the property employed by the salvors and the dangers to which it was exposed;

6. The costs in terms of labor and materials expended by the salvors in rendering the services.

*Taylor v. 42 Foot Egg Harbor Hull,* 1994 WL 779759 at *10–11 (D.N.J. June 22, 1994) (citing *The Blackwall* factors backwards).

The first factor this court will analyze is the degree of danger from which the ship was rescued. *The Blackwall,* 77 U.S. at 13–14, 10 Wall. 1. This court finds that the Memories was in serious danger at the time Gray commenced his services. When Gray arrived at the scene, the vessel was in danger of sinking and had already accumulated at least a foot to a foot and a half of water in the cabin. There was also a

substantial amount of water in the engine room. Therefore, the vessel was saved from the possibility of substantial damage. Gray testified that once the water reached the scuppers, the vessel could have sunk within an hour. He was sure that the Memories would not have survived the night. If the boat had sunk, it would have laid at the bottom of the berth and caused significant damage to the vessel.

According to Gray's testimony, the oil from the engine would have come out through the bleachers and floated to the surface, fuel would come out through the vent from the fuel tank, and a variety of other damage would occur. This would necessitate replacement of the electronics, starter motor, alternator and possibly the engine. Additionally, anything not attached to the boat would float to the surface and the water would cause upholstery and cosmetic damage. The wood most likely would be warped and the water could cause mildew, in addition to a terrible aroma in the boat that would be difficult to remove. Notwithstanding Niemiec's testimony to the contrary, this court finds that the Memories would have sunk within a day.

Testimony shows the forward bilge pump was not operational at the time the boat was taking in water. Gray and Joseph testified that the aft pump was also not operational at the time they arrived on the scene. Niemiec testified he believed the aft pump was operational but admitted it could have been Gray's pump running in the stern causing him to think the aft pump was operating. This court finds it more likely, due to the noise level of Gray's pump, that the aft pump was not operational at the time Gray arrived on the scene. Supporting this notion is Keegan's testimony regarding previous problems with the bilge pumps not turning on automatically. Therefore, the water was leak-

ing through the stuffing boxes unhindered. Furthermore, the hull specifications list the freeboard aft at three feet. Gray's testimony suggested that once the water reached the freeboard, the vessel would sink quickly. The vessel was therefore in serious peril because it would have sunk within a day without any assistance and, had it sunk, there would have been significant damage to the vessel.

■ The second factor is the post casualty value of the property saved. *The Blackwall*, 77 U.S. at 13–14, 10 Wall. 1. A salvage award should not be calculated as a percentage of the value of the vessel. *See B.V. Bureau Wijsmuller*, 702 F.2d at 339. The salvage award cannot be based on a comparative percentage method to vessels that might necessarily have a high fair market value because the award percentage for a low cost vessel must be higher to assure that the salvor recovers his costs. *Margate Shipping Co. v. M/V Ja Orgeron*, 143 F.3d 976, 993 n. 27 (5th Cir.1998).

■ The best indicator of the post casualty value of the vessel is the fair market value after the event but before any repairs. *See Ocean Services Towing and Salvage, Inc. v. Brown*, 810 F.Supp. 1258, 1263 (S.D.Fla.1993). The best method of determining the fair market value of the vessel is a sale of the vessel, conducted in a commercially reasonable manner at arm's length near the time of the salvage. *See Ocean Services Towing and Salvage, Inc.*, 810 F.Supp. at 1263. When the fair market value of the vessel has not been established, the court may look to other factors such as the amount for which the boat was insured. 3A Martin J. Norris, *Benedict on Admiralty* § 263. Although the amount for which the vessel is insured is not dispositive of the vessel's fair market value, it may be used as a factor in

determining the value. 3A Martin J. Norris, *Benedict on Admiralty* § 263.

This court previously stated it finds the fair market value of the vessel to be $60,000. This is based on Joseph's testimony as to the value of the boat in his experience and the testimony by Keegan concerning the trade in value for the vessel. It is also supported by the amount for which the vessel was insured. Niemiec, however, testifies that the boat was worth only $25,000. This court finds Joseph's testimony to be more credible in light of the factors previously mentioned.

Neither party disputes the fact that there was no significant damage to the vessel post salvage. Keegan and Joseph both testified that the vessel only required a cleaning after it had been salvaged. Keegan and Niemiec also testified that the $35,000 of subsequent work was elective and not because of any damage incurred during the salvage. Therefore, this court concludes that the post salvage value of the vessel was $60,000. The value of the vessel is not dispositive of the amount of the award but is only one of many factors to be employed. *Taylor v. 42 Foot Egg Harbor Hull,* 1994 WL 779759 at *11 (D.N.J. June 22, 1994).

■ The third element to consider is the risk incurred in saving the property from impending peril. *The Blackwall,* 77 U.S. at 13–14, 10 Wall. 1. In determining the risk incurred, the risks normally involved when salvaging a vessel should be part of the equation. *See Reynolds Leasing Corp. v. Tug Patrice McAllister,* 572 F.Supp. 1131, 1135 (S.D.N.Y.1983). "It is the risks out of the ordinary for men of that calling which are recognized and liberally rewarded in salvage cases." *B.V. Bureau Wijsmuller,* 702 F.2d at 340. In the case at bar, defendant admits that the risk involved in saving the Memories from sinking was minimal. The dangers involved were unplugging the shore power from the vessel, coming in contact with petroleum products and any carcinogenic properties associated with them and boarding a boat that may be unstable. This court finds these risks minimal.

■ Promptitude, skill and energy displayed in rendering the salvage services is the fourth factor to evaluate in determining a salvage award. *The Blackwall,* 77 U.S. at 13–14, 10 Wall. 1. "Where professional salvors expend considerable time and effort in preparing to render effective service, such preparation to provide prompt, skillful, and energetic service should be rewarded with a liberal salvage award." *H.R.M., Inc. v. S/V Venture VII,* 972 F.Supp. 92, 96 (D.R.I.1997).

In the case at bar, plaintiff is a professional salvage company, ready at all times to render competent services, entitling it to a liberal salvage award. Gray immediately arrived on the scene once he was informed that the Memories was taking on water. He was prompt in assessing the danger and returning with a pump to commence work. Joseph arrived on the scene only 15 minutes after being contacted by Gray. Additionally, Joseph contacted the owner as soon as the marina's manager appeared with the contact information.

The skill involved in this salvage included knowledge of boat construction, knowledge of pumps and how to remove water from a vessel, knowledge of power and wiring system, and awareness of the risk of an oil spill and its consequences. Furthermore, to be prepared for any salvage, all of plaintiff's employees are trained by the Coast Guard and can provide CPR or first aid. The captains employed by plaintiff have all passed a comprehensive test to become certified captains. Plaintiff also has equipment, such as the pump, available at the marina and employs Gray to re-

spond to distress calls when needed. These factors taken together weigh in favor of a liberal salvage award because plaintiff was exceptionally prompt and skillful.

■ The fifth factor playing a part in the salvage award is the value of the property employed by the salvors and the dangers to which they were exposed. *The Blackwall*, 77 U.S. at 13–14, 10 Wall. 1. The court should consider the expense of maintaining a salvage service company in addition to the property employed in this particular situation. *See H.R.M., Inc.*, 972 F.Supp. at 97. The court should also look at the risk, if any, that the plaintiff's equipment or vessel was subjected to while rendering the salvage services. *See H.R.M., Inc.*, 972 F.Supp. at 97.

Plaintiff must maintain a substantial amount of equipment, in addition to his three vessels with another vessel under construction. The equipment employed in this salvage was minimal, consisting of a pump and absorbent pads. Plaintiff arrived at the scene in one of his vessels that contained another pump. He did not, however, use the vessel or the additional pump in rendering aid. Neither the equipment nor the vessel was in danger while Joseph and Gray rendered the salvage services. Additionally, plaintiff, who bears the burden of proof, did not present any evidence as to the value of its equipment or the vessels it maintains to operate the company. Therefore, this court finds the value of the property employed by plaintiff and the dangers to which it was exposed to be minimal.

The last element to evaluate in determining a salvage award is the cost to render the services in terms of labor and materials expended by the salvors. *The Blackwall*, 77 U.S. at 13–14, 10 Wall. 1. The materials expended by the salvors were the absorbent pads, approximately 33

of them at one dollar each. The labor expended on the scene was relatively minimal. Gray worked for approximately two to three hours while Joseph spent about an hour and a half to two hours on the scene. The labor expended by Gray and Joseph was minimal because it consisted of setting up one pump and continually positioning it to effectuate rapid removal of the water. They also repeatedly placed absorbent pads both in and out of the boat to soak up the oil. This court finds that the labor and materials expended were minimal.

■ Although courts have typically focused on the six *Blackwall* factors in calculating a salvage award, several courts have added "preventing or minimizing damage to the environment" as an additional factor or as an additional consideration under the third factor. *Margate Shipping Co.*, 143 F.3d at 988; *Trico Marine Operators, Inc. v. Dow Chem. Co.*, 809 F.Supp. 440, 443 (E.D.La.1992). It is well established that preventing environmental damage in itself cannot be used to justify marine peril in order to justify a salvage award. *Fine*, 895 F.Supp. at 310. If the prerequisites of a salvage claim have already been established, however, it may be appropriate to consider prevention of environmental damage in calculating the salvage award. *See Fine*, 895 F.Supp. at 310.

In the case at bar, it is apparent that Joseph and Gray averted some environmental damage because they soaked up oil with the absorbent pads and successfully averted any further damage to the vessel leading to environmental damage. Joseph's testimony, however, shows that the sheen on the water, causing Joseph to put absorbent pads down outside the vessel, was caused by the pump Gray was operating and was not directly attributable to the boat. This court therefore finds that the averted environmental damage was mini-

mal and does not have a significant impact on the salvage award.[21]

■ As previously mentioned, the notion of granting professional salvors premium pay for successful completion of their services has been long standing and widely recognized. Andrew Anderson, *Salvage and Recreational Vessels: Modern Concepts and Misconceptions*, 6 *University of San Francisco Maritime Law Journal* 203, 228–29 (1993). Professional salvors are entitled to an incentive bonus or additional compensation because it induces them to maintain a salvage business where they are always available. *See B.V. Bureau Wijsmuller*, 702 F.2d at 340; Andrew Anderson, *Salvage and Recreational Vessels: Modern Concepts and Misconceptions*, 6 *University of San Francisco Maritime Law Journal* 203, 228–29 (1993); 3A Martin J. Norris, *Benedict on Admiralty* § 81. This court finds that plaintiff is a professional salvaging service.

Plaintiff provides 24 hour assistance seven days a week from March through December. It currently maintains three boats and is in the process of adding a fourth boat. Plaintiff maintains equipment in three places: a marina, shipyard and yacht club to accommodate the need to respond quickly to distress calls. It employs nine captains who are trained in both salvage services and first aid. Considering all of these circumstances, this court finds that plaintiff has sufficiently shown it is a professional salvage service and therefore should be entitled to a more liberal salvage award.

After considering all of the factors involved in calculating a salvage award, this court finds in favor of plaintiff for a salvage award of $11,000.

*INTEREST AND COSTS*

■ Finally, plaintiff also seeks to recover interest and costs. Costs are provided under federal law and rules promulgated by the Supreme Court. 28 U.S.C. § 1920; Fed.R.Civ.P. 54(d) (costs generally awarded to prevailing party). Taxable costs under 28 U.S.C. § 1920 are therefore awarded to plaintiff as the prevailing party. Plaintiff is further awarded post-judgment interest in accordance with 28 U.S.C. § 1961. *Clifford v. M/V Islander*, 882 F.2d 12, 13 (1st Cir.1989).

■ Prejudgment interest is generally the rule rather than the exception in admiralty salvage cases and the court has considerable discretion. *Clifford v. M/V Islander*, 846 F.2d 111, 113 (1st Cir.1988). "The general rule is that, although an admiralty court has discretion to grant or deny prejudgment interest, such interest should be granted absent peculiar circumstances." *Taylor v. 42 Foot Egg Harbor Hull*, 1994 WL 779759 at *14 (D.N.J. June 22, 1994) (quoting *Silver Star Enterprises, Inc. v. Saramacca M/V*, 1993 WL 54186 (E.D.La. Feb.25, 1993)). Thus, plaintiff is entitled to prejudgment interest. Prejudgment interest is usually granted because the defendant has had use of the plaintiff's funds and therefore should have to pay interest for that use. *See City of Boston v. SS Texaco Texas*, 599 F.Supp. 1132, 1141 (D.Mass.1984).

Several courts have chosen to award prejudgment interest from the date the salvage services were rendered. *Taylor v. 42 Foot Egg Harbor Hull*, 1994 WL 779759 at *14 (D.N.J. June 22, 1994); *Ocean Services Towing and Salvage, Inc.*, 810 F.Supp. at 1265; *see also City of Boston*,

---

**21.** This court's decision on the amount of the salvage award would remain the same irrespective of the potential impact of a sinking vessel on the environment. Averted environmental damage is an undecided issue in the First Circuit.

599 F.Supp. at 1141–42 (citing *United States v. M/V Zoe Colocotroni*, 602 F.2d 12, 13 (1st Cir.1979)) (stating general rule granting prejudgment interest in collision admiralty cases from time of collision). This court finds that the purpose underlying prejudgment interest is better served when calculating the interest from the date the salvage services were rendered.

 The rate of prejudgment interest is that allowed by statute in the state where the court is located. 3A Martin J. Norris, *Benedict on Admiralty* § 305; *see also Taylor v. 42 Foot Egg Harbor Hull*, 1994 WL 779759 at *15 (D.N.J. June 22, 1994). Under Massachusetts law, the applicable percentage rate is 12% per annum. Mass. Gen. Laws ch. 231, § 6H. Therefore, plaintiff is entitled to prejudgment interest at 12% per annum of the award amount of $11,000 from October 25, 2000 to January 21, 2003. Twelve percent of $11,000 is $1,320. The first two years therefore resulted in a prejudgment interest figure of $2,640. There are 88 days from October 25, 2002 to January 21, 2003. Prejudgment interest accrued in a daily amount of $3.62 resulting in a total amount of $318.56 for 88 days. Accordingly, plaintiff is entitled to recover prejudgment interest in the total amount of $2,958.56.

### CHAPTER 93A

 Defendant asserts plaintiff violated chapter 93A by fraudulently attempting to establish a salvage claim. Chapter 93A proscribes unfair or deceptive acts or practices. Mass. Gen. Laws ch. 93A, § 2. In the commercial context, the objectionable conduct must attain " 'a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " *Quaker State Oil Ref. Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1513 (1st Cir.1989) (citation omitted); *accord Industrial General Corp. v. Sequoia Pacific Sys. Corp.*, 44 F.3d 40, 43 (1st Cir.1995).

Stated otherwise, the conduct must fall " 'within at least a penumbra of some common law, statutory, or other established concept of unfairness,' or [was] 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury to competitors or other businessmen.' " *Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1203–04 (D.Mass.1990) (quoting *PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)); *accord General Electric Co. v. Lyon*, 894 F.Supp. 544, 552 (D.Mass.1995). As noted by the First Circuit, however, such language is oftentimes " 'uninstructive.' " *NASCO, Inc. v. Public Storage, Inc.*, 127 F.3d 148, 152 (1st Cir.1997); *accord Massachusetts Employers Insurance Exchange v. Propac–Mass, Inc.*, 420 Mass. 39, 648 N.E.2d 435, 438 (1995).

Where, as here, "there is a good faith dispute over whether payment is actually owed, and that dispute is clearly articulated, it ... appears there is no Chapter 93A liability." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir.1998). Defendant bases the chapter 93A violation upon whether plaintiff has established a valid salvage claim. This court finds that a valid salvage claim exists and therefore finds plaintiff entitled to a salvage award. Thus, the chapter 93A violation is groundless.

### CONCLUSION

This court therefore enters judgment in favor of plaintiff for a total award of $11,000 as well as prejudgment interest in the amount of $2,958.56 under Mass. Gen. Laws ch. 231, § 6H, postjudgment interest under 28 U.S.C. § 1961 and costs under 28 U.S.C. § 1920.